[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10951
_____

D.C. Docket No. 0:11-cv-61880-DMM

FREDY D. OSORIO,

Plaintiff - Appellant,

versus

STATE FARM BANK, F.S.B.,

Defendant - Third-Party Plaintiff - Appellee,

versus

CLARA BETANCOURT,

Third-Party Defendant - Appellant.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 28, 2014)

Before ANDERSON and GILMAN,[*] Circuit Judges, and JOHNSON,[**] District Judge.

GILMAN, Circuit Judge:

This is a consumer-protection case arising from the unwanted receipt of autodialed debt-collection calls to a cell phone. It began when Clara Betancourt applied for a car-insurance policy with State Farm in 2007. At the conclusion of the car-insurance application process, the State Farm agent suggested that Betancourt open a State Farm credit-card account so that the policy premium could be charged to the credit card. During the application process, Betancourt gave State Farm the phone number 754-244-8626 (No. 8626). Betancourt contends that she gave this number only as an emergency-contact number that belonged to her housemate Fredy D. Osorio, with whom she shares a cell-phone plan. State Farm, on the other hand, maintains that Betancourt gave the number as her work-phone number and that it does not collect emergency-contact information from policyholders.

---

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation

[**] Honorable Inge Prytz Johnson, United States District Judge for the Northern District of Alabama, sitting by designation

2

In 2010, Betancourt failed to timely pay the minimum balance due on her credit card. This caused State Farm's agent to place 327 autodialed calls to No. 8626 over a six-month span in an attempt to collect the balance due. Osorio sued State Farm under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, which provides a damages remedy for cellular-phone subscribers who receive autodialed phone calls without having given prior express consent to receive such calls. State Farm, in turn, sued Betancourt for the balance due (plus legal expenses) on her delinquent credit-card account and for its legal expenses in defending itself against Osorio's TCPA lawsuit, the latter claim being based on Betancourt's alleged negligent misrepresentation regarding the telephone number that she had provided to State Farm.

On cross-motions for summary judgment, the district court ruled for State Farm with regard to both complaints. The court first held that Betancourt had consented to Osorio receiving calls from State Farm and that neither Betancourt nor Osorio had effectively revoked this consent because they did not do so in writing. Second, on State Farm's breach-of-contract claim, the court held that Betancourt was delinquent on her credit-card debt. The court's final ruling was that Betancourt had negligently misrepresented that No. 8626 was her phone number, thereby causing State Farm to incur approximately $132,000 in legal fees defending itself against Osorio's action.

3

It entered judgment accordingly.  For the reasons set forth below, we **REVERSE** the district court's grant of summary judgment to State Farm on Osorio's TCPA claim, **REVERSE** its grant of summary judgment to State Farm on the latter's negligent-misrepresentation claim against Betancourt, and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual background

In May 2007, Clara Betancourt met with a State Farm agent to apply for car insurance from State Farm Mutual Automobile Insurance Company.  She also applied for a credit card from State Farm Bank to pay for the insurance policy.  Betancourt applied for the car-insurance policy first.  During the application process, State Farm's agent asked Betancourt questions orally and then entered Betancourt's responses into his computer.  The parties agree that State Farm asked for Betancourt's home number, her work number, and her cell number during the application process.

At some point during this process, Betancourt gave State Farm the No. 8626.  She testified in her deposition that "I put it down as an emergency contact[,] . . . to be for an emergency or something serious."  Betancourt acknowledged, however, that the number appears on the car-insurance application on the line marked "Work

4

Phone." She further concedes that she signed the application after it was filled in, but contends that she did not understand it.

After completing Betancourt's car-insurance application, the agent offered to put Betancourt's insurance payment on a State Farm credit card. Betancourt agreed. She says that the agent then used the information that he had already taken for the insurance application to apply for the credit card. The credit-card application listed 954-963-1917 (No. 1917) as Betancourt's home phone, 954-549-7596 (No. 7596) as Betancourt's work phone, and No. 8626 as Betancourt's cell phone.

Documents produced by the phone company, Metro PCS, indicate that No. 8626, along with 754-244-5645 (No. 5645) and 754-244-2131 (No. 2131), were all connected to a single "individual" account that belonged to Osorio. Betancourt and Osorio both testified in their respective depositions that No. 8626 belonged to Osorio, and Betancourt testified that No. 5645 belonged to her. She further testified that No. 2131 belonged to John Fredy Osorio, who is the adult son of Betancourt and Osorio.

Betancourt and Osorio have known each other for many years. They lived together in South Florida at all times relevant to this case.

Betancourt modified her contact information in connection with the credit card several times in the years that followed. In June 2007, she returned a change-

5

of-address form to State Farm Bank that she had received along with her bill. Betancourt testified that she did not understand the form, but nonetheless filled it out, listing No. 1917 as her home phone and No. 8626 as her work phone. State Farm's records subsequently show that "[o]n May 29, 2008, Betancourt requested that State Farm Bank update its records to reflect her home phone number had changed to [No. 8626], replacing the home number of [No. 1917]." She apparently did this over the telephone.

Of particular importance for the purpose of this appeal, Betancourt testified in her deposition that on September 29, 2010, she again spoke with someone from State Farm and informed the agent that (1) No. 5645 was her cell-phone number, and (2) No. 8626 was Osorio's number to be used "only for emergencies." She also says that at this time she told State Farm to call her only on No. 1917. State Farm acknowledges that Betancourt called on September 29, 2010 to request that her records be updated, but contends that she gave No. 5645 as her home number and that she made no change to the listing of No. 8626 as her work number.

Betancourt made regular payments on her credit card until November 26, 2010, on which date she failed to make a payment. As a result, State Farm authorized a collection agency, FMS, Inc., to attempt to collect the debt as State Farm's agent. State Farm gave FMS No. 5645 as Betancourt's home number and No. 8626 as Betancourt's work number. FMS made calls to these numbers

6

beginning on November 29, 2010 and concluding on May 31, 2011, including 327 autodialed calls to No. 8626.

State Farm maintains that at no time did anyone answering No. 8626 tell it that the number did not belong to Betancourt. The person answering simply said that Betancourt was not available. State Farm says that it did not learn that No. 8626 was Osorio's number until after the filing of this lawsuit. Osorio, on the other hand, testified that he twice told State Farm's agent to "Please stop calling" when the agent called him on No. 8626. He says that these callers always spoke in English, and that he did not understand them.

Betancourt acknowledges that she had an outstanding credit-card balance of $7,945.10 as of June 1, 2011. She explained that this amount was in large part due to State Farm's decision to raise her annual interest rate to 24%.

## B. Procedural background

Osorio sued State Farm in August 2011, alleging violations of the TCPA. Four months later, State Farm filed a Third-Party Complaint against Betancourt, asserting claims for (1) common-law indemnification because "[t]he credit agreement between State Farm and Betancourt formed a legal special relationship," making any "damages Osorio alleges in his complaint . . . a result of Betancourt's acts or omissions"; (2) contractual indemnification based on the credit-card agreement's provision making Betancourt liable for collection costs; (3) breach of

7

contract for Betancourt's failure to pay her credit-card bill; (4) negligent misrepresentation for Betancourt giving Osorio's number as her own; (5) account stated for the outstanding balance on Betancourt's credit card; and (6) open account for debts under the credit-card agreement.

Betancourt, Osorio, and State Farm all separately moved for summary judgment on their respective claims and defenses.  The district court granted summary judgment to State Farm on Osorio's claim and also granted summary judgment to State Farm on four of its claims against Betancourt.  Relying on this court's unpublished opinion in *Meadows v. Franklin Collection Services, Inc.*, 414 F. App'x 230, 235 (11th Cir. 2011) (per curiam), the district court reasoned that "[i]f Osorio could sue State Farm for over $75,000 because the woman with whom he cohabitates with [sic] and had a child with provided 'his' number to State Farm on multiple occasions, debt collectors would be held liable whenever a debtor lists a family member's number as his own."  The court further reasoned that Betancourt provided express consent for State Farm to call No. 8626 and had the authority to do so because she lives with Osorio, had a son with him, and shares a cell-phone plan with him that is listed in his name.  Finally, the court held that consent cannot be revoked orally under the TCPA, relying on out-of-circuit district court cases holding to that effect.

8

In a separate order entered the same day, the district court determined that State Farm's indemnification claims were moot in light of the court's holding that State Farm was not liable for the calls. The court further ruled that Betancourt had breached the credit-card agreement by failing to pay her minimum balance on time and by failing to provide a valid phone number. On State Farm's negligent-misrepresentation claim, the court held that Betancourt misrepresented to State Farm that No. 8626 was her phone number and did so knowingly. The court thus determined that Betancourt was liable for $132,419.90 in legal fees incurred by State Farm in defending itself against Osorio's TCPA claim.

It also ruled for State Farm on its claims for account stated and open account in the amount of $8,355.27, "with an additional $1.03 per diem rate beginning after May 30, 2012." Finally, the court held Betancourt and Osorio jointly and severally liable to State Farm for costs in the amount of $4,952.15. Betancourt and Osorio have appealed the district court's judgments with respect to the TCPA and negligent-misrepresentation claims; Betancourt has not appealed the district court's judgment against her for account stated and open account.

## II.  JURISDICTION

Before addressing the merits of this case, we note that Osorio asserted jurisdiction based on diversity of citizenship, alleging that State Farm is a citizen of Illinois, that he is a citizen of Florida, and that the amount in controversy

9

exceeds $75,000.  Since the filing of the Complaint, the Supreme Court has held that state and federal courts have concurrent jurisdiction over TCPA claims.  *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012) ("We find no convincing reason to read into the TCPA's permissive grant of jurisdiction to state courts any barrier to the U.S. district courts' exercise of the general federal-question jurisdiction they have possessed since 1875.").  Jurisdiction is thus also proper under the Federal-Question Statute, 28 U.S.C. § 1331.  *See Mims*, 132 S. Ct. at 748 ("Because federal law creates the right of action and provides the rules of decision, Mims's TCPA claim, in 28 U.S.C. § 1331's words, plainly aris[es] under the laws . . . of the United States.") (alteration in original) (internal quotation marks omitted).

## II.  OSORIO'S CLAIMS AGAINST STATE FARM

### A.  Standard of review

"We review a district court's order of summary judgment de novo, viewing all evidence and drawing all reasonable inferences in favor of the nonmoving party."  *Pesci v. Budz*, 730 F.3d 1291, 1295 (11th Cir. 2013).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

### B.  TCPA

10

Osorio contends on appeal that the district court made two critical errors. First, Osorio argues that the court misinterpreted the TCPA when it held that Betancourt had the authority to consent to receiving autodialed debt-collection calls on No. 8626. Second, Osorio claims that the court should have found that he revoked any consent that State Farm may have had to call his number when he told State Farm's agent to stop calling. State Farm responds that Betancourt validly gave her consent because she had "common authority over the phone" and because Osorio's request was both ambiguous in scope and not in writing. It also contends that the TCPA prohibits autodialed calls only when the called party is charged for each specific call.

### 1. Legal framework

The key provision of the TCPA applicable to this case is 47 U.S.C. § 227(b)(1)(A)(iii), which provides in pertinent part that

> [i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—
>
> > (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—
> >
> > > . . .

> (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call . . . .

47 U.S.C. § 227(b)(1)(A)(iii).

The statute further specifies that the appropriate remedy is "an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater."  47 U.S.C. § 227(b)(3)(B).  Treble damages are also available for knowing or willful violations.  *Id.* § 227(b)(3) (concluding language).

### 2.  *"[P]rior express consent of the called party"*

This circuit has not yet addressed the meaning of the term "called party" as used in the TCPA, but State Farm argues that an unpublished decision, *Meadows v. Franklin Collection Service, Inc.*, 414 F. App'x 230 (11th Cir. 2011) (per curiam), is directly on point.  In *Meadows*, a debt-collection agency placed numerous prerecorded calls to Meadows's home in an attempt to collect on debts owed by the previous residents of the home and by Meadows's daughter.  This court ruled that the debt collector "did not violate the TCPA because . . . [it] had an existing business relationship with the intended recipient of its prerecorded calls."  *Id.* at 235.  Based upon the quoted language, State Farm argues that the "called party" within the meaning of the TCPA must be the "intended recipient."  This would

12

mean that Betancourt, as the intended recipient of State Farm's calls, could consent to Osorio receiving the calls on No. 8626.

*Meadows*, however, is of very limited value. To start with, the case concerned 47 U.S.C. § 227(b)(1)(B), which prohibits "initiat[ing] any telephone call to any *residential telephone line* using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." (emphasis added). No. 8626, the telephone number in question here, is a cell-phone number. Moreover, 47 U.S.C. § 227(b)(2)(B) permits the FCC "by rule or order, [to] exempt [certain categories of calls] from the requirements of paragraph (1)(B) of this subsection [*i.e.*, 47 U.S.C. § 227(b)(1)(B)]." In 1992, the FCC promulgated just such a regulation, one that exempts calls "made to any person with whom the caller has an established business relationship at the time the call is made." 47 C.F.R. § 64.1200(a)(2)(iv). The *Meadows* court relied on this exemption when it determined that the debt collector "did not violate the TCPA because . . . [it] had an existing business relationship with the intended recipient of its prerecorded calls." *Meadows*, 414 F. App'x at 235.

As Osorio points out, whatever the merits of *Meadows*, 47 U.S.C. § 227(b)(2)(B) does not authorize rulemaking with regard to 47 U.S.C. § 227(b)(1)(A)(iii), the provision in question here. The term "intended recipient" as used in *Meadows*, moreover, is discussed in connection with the words "made to

13

any person" as used by the regulation, 47 C.F.R. § 64.1200(a)(2)(iv) (2008), and was not directed at the term "called party" as used by the statute. *See Meadows*, 414 F. App'x at 235. And because the regulation does not bear on § 227(b)(1)(A)(iii), neither does *Meadows*.

Only one court of appeals, the Seventh Circuit, appears to have addressed the meaning of the term "called party" in the context of 47 U.S.C. § 227(b)(1)(A)(iii). In a case brought by cell-phone subscribers receiving debt-collection calls directed at prior subscribers to their phone numbers, Judge Easterbrook canvassed the statute and reasoned as follows:

> Section 227 uses the phrase "called party" seven times all told. Four unmistakably denote the current subscriber (the person who pays the bills or needs the line in order to receive other calls); one denotes whoever answers the call (usually the subscriber); and the others (the two that deal with consent) have a referent that cannot be pinned down by context. [Defendant] Enhanced Recovery asks us to conclude that, despite the presumption of uniform usage within a single statutory section, those two uses, and those two alone, denote the person Bill Collector is trying to reach—in other words, Customer, who Enhanced Recovery dubs the "intended recipient of the call."

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 640 (7th Cir. 2012). But, as Judge Easterbrook explained, "The presumption that a statute uses a single phrase consistently, at least over so short a span, *see Mohasco Corp. v. Silver*, 447 U.S. 807 (1980), implies that the consent must come from the current subscriber." *Soppet*, 679 F.3d at 639–40. We agree.

14

The Seventh Circuit also expressly refuted State Farm's contention that the statute uses the term "called party" to refer to the intended recipient of the phone call:

> The phrase "intended recipient" does not appear anywhere in § 227, so what justification could there be for equating "called party" with "intended recipient of the call"? (Section 227(b)(1) does use the word "recipient" in a context where "recipient" means "current subscriber"; this doesn't remotely suggest that "called party" must mean "intended recipient.") Enhanced Recovery starts with the proposition that consent is effective until revoked and infers that Customer's consent thus must last until Bystander, the new subscriber, revokes it. The idea that one person can revoke another's consent is odd. Anyway, there can't be any long-term consent to call a given Cell Number, because no one—not Customer, not Bystander, not even the phone company—has a property right in a phone number. *See Jahn v. 1–800–FLOWERS.com, Inc.*, 284 F.3d 807 (7th Cir. 2002). Consent to call a given number must come from its current subscriber. Enhanced Recovery implicitly acknowledges this by saying that the current subscriber can rescind any earlier consent to call Cell Number. But this really means that Customer's authority to give consent, and thus any consent previously given, lapses when Cell Number is reassigned.

*Id.* at 640–41.

We find this logic persuasive. Although State Farm argues that Betancourt could consent to the debt-collection calls (she being the equivalent of the Customer in *Soppet*), it also concedes that Osorio could revoke Betancourt's consent (he being the equivalent of the Bystander in *Soppet*). In tune with Judge Easterbrook's analysis, we believe this really means that Betancourt had no authority to consent in her own right to the debt-collection calls to No. 8626 because one can consent to

15

a call only if one has the authority to do so, and only the subscriber (here, Osorio) can give such consent, either directly or through an authorized agent. We accordingly reject State Farm's argument that the "intended recipient" is the "called party" referred to in 47 U.S.C. § 227(b)(1)(A).

Determining the meaning of the term "called party" is, however, only half of our challenge. We must still decide how one obtains the "prior express consent" of the called party. For purposes of this appeal only, we accept as valid the FCC's regulation to the effect that "autodialed . . . calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party." *In re Rules & Reg. Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 559 (2007). We do so because counsel for Betancourt and Osorio have disclaimed any intent to challenge the regulation. But even accepting *arguendo* the regulation's validity, we must still determine whether Osorio, directly or indirectly, gave No. 8626 to State Farm as a number to call in connection with Betancourt's debt. As applied to the facts of the present case, we must therefore decide whether Betancourt had the authority to consent to Osorio receiving the calls, and whether she in fact did so.

The district court held that Betancourt could provide the requisite consent because she had "common authority" over No. 8626. It based this decision on the

16

ruling in *Guitierrez v. Barclays Group*, No. 10cv1012, 2011 WL 579238 (S. D. Cal. Feb 9, 2011).  In *Guitierrez*, the plaintiff Ramon listed the cell-phone number of his wife, Clariza, on a credit-card application.  He eventually defaulted on the payments, provoking collection calls from the defendant.  The district court held that Ramon could consent to Clariza receiving the debt-collection calls, *id.* at *3, relying on a Supreme Court decision issued in the Fourth Amendment context holding "that permission to search [may be] obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."  *Id.*  (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).  The Fourth Amendment analogy, however, predates the cell-phone era, and the equivalency that the *Guitierrez* court sought to draw is otherwise lacking in authority.  We therefore decline to adopt *Guitierrez*'s Fourth Amendment "common authority" analogy.

The Third Circuit's recent decision in *Gager v. Dell Financial Services, LLC*, 727 F.3d 265 (3d Cir. 2013), offers a more compelling approach.  *Gager* concerned the same type of § 227(b)(1)(A)(iii) claim as presented here.  The case considered "whether the TCPA allows a consumer to revoke her 'prior express consent' to be contacted via an automated telephone dialing system on her cellular phone."  *Id.* at 268.  Critically, the Third Circuit resolved this question based on "the common law concept of consent."  *Id.* at 270.  The Third Circuit also reasoned

17

that, "in light of the TCPA's purpose, any silence in the statute as to the right of revocation should be construed in favor of consumers." *Id.* These considerations provide us with a useful roadmap for deciding whether Betancourt had the authority to consent to Osorio receiving autodialed calls from State Farm.

"[W]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999) (second alteration in original) (internal quotation marks omitted). "Consent" is such a term, as the Third Circuit aptly explained:

> Under the common law understanding of consent, the basic premise of consent is that it is "given voluntarily." Black's Law Dictionary, 346 (9th ed. 2009); Restatement (Second) of Torts § 892 ("Consent is a willingness in fact for conduct to occur."). Further, at common law, consent may be withdrawn. Restatement (Second) of Torts § 892A, cmt. i (1979) ("[C]onsent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct."); *see also United States v. Greer*, 607 F.3d 559, 564 (8th Cir. 2010) (discussing a criminal suspect's right to withdraw consent to a search); *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1351 (7th Cir. 1995) (discussing the common law right of a proprietor to revoke consent for a patron to enter a store).

*Gager*, 727 F.3d at 270–71. The same logic is applicable to the concept of consent in this case: To fall within § 227(b)(1)(A)(iii)'s consent exception, State Farm

18

must demonstrate that it had the consent of Osorio, as defined by the common law, to call No. 8626.

One way for State Farm to do so would be by demonstrating that Betancourt had an agency relationship with Osorio that permitted her to consent to Osorio receiving the calls, and by showing that she exercised that authority in this case by giving No. 8626 to State Farm in connection with her debt. "It is settled law that the acts of an agent, within the scope of his real or apparent authority, bind the principal." *Peninsula Land Co. v. Howard*, 6 So. 2d 384, 388 (Fla. 1941). Agency can be viewed as having some overlap with *Guitierrez*'s notion of "common authority" but, unlike the "common-authority" concept connected with criminal law search and seizures, agency law developed in a civil context to handle commercial and tort disputes more analogous to the TCPA.

Under Florida law,

> [a]n agency relationship can arise by written consent, oral consent, or by implication from the conduct of the parties. *See Thomkin Corp. v. Miller*, 156 Fla. 388, 24 So. 2d 48, 49 (1945). An agency by implication, or apparent agency, arises only when there has been (1) a representation by the principal that the actor is his or her agent, (2) reliance on that representation by a third party, and (3) a change in position by the third party in reliance on that representation. *See Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995). As to the first element, when there has been no representation of authority by the principal, no apparent or implied agency arises. *See Smith v. Am. Auto. Ins. Co.*, 498 So. 2d 448, 449 (Fla. 3d DCA 1986). The acts of the agent, standing alone, are insufficient to establish that the agent is authorized to act for the principal. *See Owen Indus., Inc. v.*

19

> *Taylor*, 354 So. 2d 1259, 1262 (Fla. 2d DCA 1978); *Taco Bell of Cal. v. Zappone*, 324 So. 2d 121, 124 (Fla. 2d DCA 1975); *Smith*, 498 So. 2d at 449.  Moreover, the scope of the agent's authority is limited to what the principal has authorized the agent to do.  *See Poe & Assocs., Inc. v. Estate of Vogler*, 559 So. 2d 1235, 1236 (Fla. 3d DCA 1990).

*Stalley v. Transitional Hosps. Corp. of Tampa, Inc.*, 44 So. 3d 627, 630 (Fla. Dist. Ct. App. 2010).

As applied to Osorio's case, the key facts regarding agency are clearly in dispute.  Betancourt and Osorio testified in their respective depositions that they have never given each other authority to consent to phone calls from third parties.  State Farm nevertheless contends that the court should infer such authority because Osorio and Betancourt have an adult son and shared both a home and a cell-phone plan.  But State Farm's argument, if accepted, proves too much.  Parents and cohabitants everywhere would be shocked to learn that every adult in their household is legally entitled to consent to having autodialing debt collectors call any of their cell phones.  This is not to say that in some cases one adult might authorize another adult to do so, but we cannot say that all cohabitants possess such authority as a matter of law.  Moreover, if, as Betancourt claims, she told State Farm that No. 8626 was to be used only for emergencies, a jury could find that she was exercising only a limited scope of agency, not the agency to consent to 327 autodialed debt-collection phone calls to Osorio's cell-phone number.

20

A genuine dispute of material fact therefore exists as to whether Betancourt acted as Osorio's agent when she gave State Farm No. 8626 as a contact number. Accordingly, this is not an issue that can properly be decided on summary judgment. The issue must instead be submitted to a factfinder.

### 3. Revocation

On a related topic, the district court ruled that once Betancourt consented to receiving autodialed calls on No. 8626, that consent could be revoked only in writing. The court relied on four cases from the Western District of New York in support of its ruling. Like the district court, those cases read the TCPA as subordinate to the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.*, which requires a consumer to notify a debt collector *in writing* if the consumer desires to stop further communication. *See id.* § 1692c(c). The district court quoted from one such case, *Starkey v. Firstsource Advantage, LLC*, No. 07-CV-662A, 2010 WL 2541756 at *5 (W.D.N.Y. Mar. 11, 2010), which held that "as clearly stated in the December 28, 2007 FCC Declaratory Ruling, calls regarding debt collection or to recover payments are not subject to the TCPA's separate restrictions on 'telephone solicitations.'" (quoting *Starkey*, No. 07-CV-662A, 2010 WL 2541756 at *5).

The 2007 Declaratory Ruling, however, is hardly persuasive on the question at hand. It states in pertinent part as follows:

21

We also reiterate that the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party.  We note that this prohibition applies regardless of the content of the call, and is not limited only to calls that constitute "telephone solicitations."  However, we agree with ACA and other commenters that calls solely for the purpose of debt collection are not telephone solicitations and do not constitute telemarketing.  Therefore, calls regarding debt collection or to recover payments are not subject to the TCPA's separate restrictions on "telephone solicitations."

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 565 (2007) (footnotes omitted).

The above reasoning is inapplicable to the present case.  First, as the ruling states, debt-collection calls are not exempt from 47 U.S.C. § 227(b)(1)(A)(iii); they are exempt only from "the TCPA's separate restrictions on 'telephone solicitations.'"  23 F.C.C. Rcd. at 565 (footnotes omitted).  Second, the ruling's only reference to the FDCPA beyond that quoted above suggests that debt-collection calls are subject to restrictions under *both* the TCPA and the FDCPA.  This other reference states that "[d]ebt collection calls are regulated *primarily* by the Federal Trade Commission and are subject to the requirements of the Fair Debt Collection Practices Act (FDCPA), which prohibits abusive, deceptive, and otherwise improper collection practices by third-party collectors."  *Id.* at 559 n.2 (emphasis added).  The word "primarily" clearly implies that other laws, such as the TCPA, may also regulate debt-collection calls.

22

Furthermore, nothing in the statutory text of the TCPA or of the FDCPA indicates that compliance with the FDCPA excuses compliance with the TCPA. The FDCPA explicitly specifies that "[i]f a consumer notifies a debt collector *in writing* that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt." 15 U.S.C. § 1692c(c) (emphasis added). Because the TCPA lacks equivalent language, we have no reason to assume that Congress intended to impose a similar in-writing requirement on the revocation of consent under the TCPA.

We thus conclude that the district court's reasoning conflates apples and oranges. The FDCPA, on which both the district court and the Western District of New York courts relied, is a separate statute with an independent cause of action for violations.

We instead presume from the TCPA's silence regarding the means of providing or revoking consent that Congress sought to incorporate "the common law concept of consent." *See Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270 (3d Cir. 2013); *see also Neder v. United States*, 527 U.S. 1, 21 (1999) ("[W]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means

23

to incorporate the established meaning of these terms.") (second alteration in original) (internal quotation marks omitted).  The statement of Senator Ernest "Fritz" Hollings, who introduced the TCPA, indicates as much.  Senator Hollings noted that the bill "allows consent to be given orally, in writing, electronically, or by any other means, as long as the consent is expressly given to the particular entity making the call."  137 Cong. Rec. 30,822 (1991).  From this statement, one can infer that Congress intended for the TCPA to incorporate the common-law meaning of consent, including its revocation.

Common-law notions of consent generally allow oral revocation.  *See Pepe v. Shepherd*, 422 So. 2d 910, 911 (Fla. Dist. Ct. App. 1982) ("[I]t is axiomatic that no agreement need be in writing unless required by statute or contract.").  Indeed, counsel for State Farm conceded at oral argument that "the common law would allow an oral revocation."  We therefore conclude that Betancourt and Osorio, in the absence of any contractual restriction to the contrary, were free to orally revoke any consent previously given to State Farm to call No. 8626 in connection with Betancourt's credit-card debt.

Furthermore, we note that allowing consent to be revoked orally is consistent with the "government interest articulated in the legislative history of the Act [that] enabl[es] the recipient to contact the caller to stop future calls." *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376–77 (4th Cir. 2013).

24

Senator Hollings, the TCPA's sponsor, described these calls as "the scourge of modern civilization.  They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall."  137 Cong. Rec. 30,821 (1991).  Senator Hollings presumably intended to give telephone subscribers another option: telling the autodialers to simply stop calling.

Finally, we note that the FCC has provided persuasive guidance confirming that called parties may revoke their consent orally.  In a recent declaratory ruling, the FCC explained that "requests to stop receiving voice calls . . . can be confirmed during the same call in which a consumer has expressed a desire to opt out."  *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 15391, 15398 (2012).  This guidance is not dispositive of the present case because the FCC issued its ruling after the calls in question and because the ruling may not have been promulgated with the requisite meaningful review to invoke *Chevron* deference.  *See Gager*, 727 F.3d at 271 n.5 ("*Chevron* deference appears to be inappropriate here because the FCC never articulated a rationale for deciding why the TCPA affords consumers the right to revoke their prior express consent.").  Nevertheless, we find its common-sense interpretation to be of persuasive value.  *See United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) ("[A]n agency's interpretation may merit some deference whatever its form, given the specialized

25

experience and broader investigations and information available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires.") (internal quotation marks omitted).

Accordingly, the question of whether either Betancourt or Osorio effectively revoked whatever consent State Farm might have had to call No. 8626 should proceed to a jury. Osorio says that he twice told State Farm to "stop calling." State Farm says that he did no such thing. This is exactly the kind of factual dispute that cannot properly be resolved on summary judgment.

### 4. *Charge requirement*

We now turn to State Farm's alternative argument that it is entitled to summary judgment because of "the undisputed fact that neither Osorio nor Betancourt were charged for the calls in question." The TCPA prohibits calls "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A)(iii).

State Farm argues that the FCC has interpreted this provision to require a separate charge for each call in order for the calls to be actionable. It also contends that the "rule of punctuation" indicates that the "charged" clause modifies the entire series—pager service, cellular service, etc. Osorio responds that the rule of

26

punctuation is inapplicable and that the case instead falls within the more general rule of "the last antecedent," which specifies that "relative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to or including others more remote." *Bingham, Ltd. v. United States*, 724 F.2d 921, 925 n.3 (11th Cir. 1984) (internal quotation marks omitted).  He also argues that the FCC's guidance is not controlling.

First, we do not accept State Farm's contention that the FCC's ruling in question controls the outcome of this case.  The applicable ruling reads in relevant part as follows:

> Based on the plain language of § 227(b)(1)[(A)](iii), we conclude that the TCPA did not intend to prohibit autodialer or prerecorded message calls to cellular customers for which the called party is not charged. Moreover, neither TCPA nor the legislative history indicates that Congress intended to impede communications between radio common carriers and their customers regarding the delivery of customer services by barring calls to cellular subscribers for which the subscriber is not [charged].

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8775 (1992).  In our view, the key language is the second sentence of the above-quoted ruling.  The use of the word "[m]oreover" links the two sentences and indicates that a narrower reading of the preceding sentence is appropriate.  We thus believe that the 1992 ruling was intended to exempt only

27

"communications between radio common carriers and their customers" with regard to autodialed calls for which the subscriber is not charged, and that the ruling does not apply to third parties such as State Farm.

In support of its contrary argument, State Farm contends that we lack jurisdiction in this case to cast doubt on the validity of the FCC's order. But State Farm's argument is off the mark because we are not called upon here to assess the order's validity. We are instead simply deciding whether the FCC's 1992 ruling is applicable to the present case. And based on our analysis as set forth above, we hold that it is not applicable regardless of whether it is otherwise valid.

In the end, we go back to the basic question of whether the TCPA itself exempts all autodialed calls for which there is no charge. The applicable canons of construction indicate that it does not. To repeat the key language, the Act prohibits autodialed calls "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(A)(1)(iii). The rule of the last antecedent requires the phrase "for which the called party is charged for the call," *id.*, "to be applied to the words or phrase immediately preceding [i.e., "any service"], and . . . not to be construed as extending to or including others more remote," s*ee Bingham, Ltd. v. United States*, 724 F.2d 921, 925 n.3 (11th Cir. 1984) (internal quotation marks omitted); namely,

"paging," "cellular telephone," or "mobile radio" services, 47 U.S.C. § 227(b)(A)(1)(iii). We therefore presume that Congress did not intend the phrase "for which the called party is charged for the call" to apply to cellular telephone services.

Nevertheless, "[w]here the modifier is set off from two or more antecedents by a comma, the supplementary 'rule of punctuation' states that the comma indicates the drafter's intent that the modifier relate to more than the last antecedent." *Bingham*, 724 F.2d at 925 n.3. This rule is, however, inapplicable to the language in question. The modifier in this case, "for which the party is charged," is not set off from the series by a comma. That is, for the rule of punctuation to apply, 47 U.S.C. § 227(b)(1)(A)(iii) would have to read "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service**,** for which the called party is charged for the call." Because the final comma emphasized in the above iteration does not appear in the statute, we conclude that the phrase "for which the called party is charged for the call" modifies only "any service" and not the other terms of the series.

Reading the phrase "for which the party is charged" as modifying only "any service" also comports with the canon against superfluity. The canon against superfluity instructs that "[i]t is our duty to give effect, if possible, to every clause

and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks omitted).  If the phrase "any service for which the called party is charged for the call" requires that the party be charged per call for the "paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service" in order for the party to prohibit autodialed calls, then the listing of these services would be superfluous because they are already included under the term "any service for which the called party is charged."  On the other hand, reading "any service for which the called party is charged for the call" as an additional item beyond any call to a "paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service," regardless of whether the called party is charged, gives independent meaning to each term.

An interpretation of 47 U.S.C. § 227(b)(1)(A)(iii) that exempts all autodialed calls to cellular phones for which the called party is not charged per call, moreover, would clash with § 227(b)(2)(C) of the same statute.  This latter section specifies that the FCC

> may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect.

47 U.S.C. § 227(b)(2)(C). The provision allowing for the promulgation of exemptions would be meaningless if, as State Farm proposes, § 227(b)(1)(A)(iii) already exempts all calls for which the party is not charged per call.

Finally, we note that our interpretation is consistent with the decisions of our sister circuits. The Ninth Circuit has interpreted the TCPA as not requiring that the called party be charged for the call, albeit only in passing. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 950 (9th Cir. 2009) (holding for the plaintiff despite the defendant's allegation that the plaintiff's TCPA claim was deficient because she was not charged for call). And the Fourth Circuit, in analyzing the TCPA's legislative history, noted that "[t]he TCPA protects residential privacy—a government interest articulated in the legislative history of the Act." *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376–77 (4th Cir. 2013). To state the obvious, autodialed calls negatively affect residential privacy regardless of whether the called party pays for the call. We therefore find ourselves in good company in holding that Osorio is not required to prove that he was charged individually for each of the autodialed calls.

## V. STATE FARM'S THIRD-PARTY COMPLAINT

We now turn to State Farm's third-party complaint against Betancourt. The district court held that Betancourt indisputably knew that No. 8626 was Osorio's number, but negligently represented to State Farm that it was her own. It further

31

determined that State Farm indisputably relied on this representation, incurring significant legal expenses to defend against Osorio's current action.

Betancourt contends, however, that summary judgment was inappropriate on this claim. She advances two arguments in support of her appeal. First, Betancourt points out that if she is ultimately found to have had the authority to consent to Osorio receiving the calls, then her consent could not possibly have been a misrepresentation. Second, she argues that State Farm has failed to prove the element of "justifiable reliance" because it had no justifiable reason to even start the autodialing after she had informed State Farm that No. 8626 was only for emergencies or to continue the autodialing after Osorio told State Farm's agent to stop calling. State Farm responds by claiming that neither Betancourt nor Osorio in fact communicated any change from Betancourt's earlier misrepresentation that No. 8626 was her work number, making its legal bills recoverable under Florida's wrongful-act doctrine.

Florida follows the Restatement (Second) of Torts with respect to negligent misrepresentation. *Gilchrist Timber Co. v. ITT Rayonier, Inc*., 696 So. 2d 334, 339 (Fla. 1997) ("By this opinion, we adopt the Restatement (Second) of Torts' position on negligent misrepresentation contained in section 552."). Section 552 of the Restatement provides that

32

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977). Accordingly, this court has held that

> [u]nder Florida law, a claim of negligent representation requires showing four elements:
>
> > (1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation.

*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.*, 607 F.3d 742, 747 (11th Cir. 2010) *certified question answered*, 110 So. 3d 399 (Fla. 2013). Another significant point is that "comparative negligence applies to an action for negligent misrepresentation." *Gilchrist Timber*, 696 So. 2d at 335.

We will now proceed to analyze the evidence with regard to each element in turn. In so doing, we will determine whether summary judgment was appropriate or whether genuine disputes of material fact necessitate a trial.

### 1. Misrepresentation of material fact

State Farm argues that Betancourt misrepresented No. 8626 as her work number. Betancourt responds by contending that she never represented the number as her own, but instead listed it only as an emergency-contact number. This clearly presents a genuine dispute of a material fact. The dispositive question appears to be whether Betancourt told State Farm on September 29, 2010 that No. 8626 was to be used only for emergencies. If she did, then she would have corrected any material misrepresentation well before State Farm relied upon it following Betancourt's credit-card default almost two months later.

Betancourt says that she so informed State Farm. She testified in her deposition that she told State Farm on September 29, 2010 that No. 1917 was her home number and that No. 8626 was to be used only for emergencies. State Farm acknowledges that Betancourt indeed called on that date to update her contact information, but says that the only change was to reflect that No. 5645 was her home number, with no change to the listing of No. 8626 as her work number. This genuine dispute of material fact should properly be submitted to a jury.

### 2. *Knowledge of falsity*

Betancourt repeatedly says in her deposition that No. 8626 was Osorio's number. Accordingly, if she represented the number as her work number, she would have known that it was false. Betancourt does not seriously contest this element beyond denying that she so informed State Farm.

34

### 3. *Intent to induce another to act on the misrepresentation*

Although Betancourt does not seriously contest that she intended State Farm to rely on the information that she gave it, this element is nevertheless wrapped up in a factual dispute over whether she told State Farm that No. 8626 was to be used only for emergencies. If Betancourt gave the number as her work number, as the June 12, 2007 change-of-address form indicates, and if she did not countermand this information on September 29, 2010 as she contends, then a jury could find that she did intend for State Farm to contact her at No. 8626 regarding her credit-card debt. We therefore conclude that the dispute surrounding whether Betancourt intended that State Farm contact her at No. 8626 in connection with her debt must be decided by a jury.

### 4. *Justifiable reliance on the misrepresentation*

A party "is responsible for investigating information that a reasonable person in the position of the recipient would be expected to investigate. Thus, a recipient of an erroneous representation cannot hide behind the unintentional negligence of the misrepresenter when the recipient is likewise negligent in failing to discover the error." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (internal quotation marks omitted).

Here, again, factual issues preclude summary judgment. If a jury were to find that Betancourt told State Farm on September 29, 2010 that No. 8626 was

35

"only for emergencies," then a reasonable person would have investigated why it was listed in State Farm's records as her work number.  Likewise, if Osorio twice told State Farm to "stop calling," a reasonable person would have inquired further into the validity of No. 8626 as Betancourt's contact number for debt collection.

The TCPA's express-consent requirement reinforces this conclusion because a reasonable person would have inquired, upon being told that the number was only for emergencies or not to be called at all, whether he or she had consent to call the number in connection with a debt.  Accordingly, we hold that this element should also be submitted to a jury.

### 5.  *Wrongful-act doctrine*

State Farm further argues that it is entitled to recovery under Florida's wrongful-act doctrine.  A recent decision by a Florida appellate court has explained the doctrine as follows:

> [W]here the wrongful act of the defendant has involved the claimant in litigation with others, and has placed the claimant in such relation with others as makes it necessary to incur expenses to protect its interest, such costs and expenses, including reasonable attorney's fees upon appropriate proof, may be recovered as an element of damages.

*Reiterer v. Monteil*, 98 So. 3d 586, 588 (Fla. Dist. Ct. App. 2012) (alteration in original).

State Farm asserts that the district court evaluated this claim, but does not cite where in the record such an evaluation can be found.  Moreover, State Farm

36

provides no citation to a case where the Florida Supreme Court has recognized the wrongful-act doctrine, and this court appears to have addressed it only in an unpublished opinion in which the claim was deemed abandoned. *See James Ventures, L.P. v. TIMCO Aviation Servs., Inc.*, 403 F. App'x 425, 426 (11th Cir. 2010) (per curium). We therefore question how well-established the doctrine is in Florida.

In any event, we have no reason to pursue such an evaluation at the present stage of the case. This is because State Farm is entitled to legal fees under the wrongful-act doctrine only if Betancourt's actions were in fact wrongful. A jury must make that determination for the reasons that we have just explained. If Osorio is found to have authorized Betancourt to give No. 8626 to State Farm in connection with her credit-card debt, then her actions were not wrongful. But if Betancourt is found to have negligently misrepresented No. 8626 as her contact number, and if State Farm is found to have reasonably relied on that misrepresentation, then State Farm might be entitled to some recovery under the wrongful-act doctrine. We leave this issue concerning the validity and applicability of the wrongful-act doctrine to the district court for reconsideration in the first instance.

For the same reason, we decline to determine at this time the reasonableness of the approximately $132,000 in legal fees awarded to State Farm. That question

37

is fully intertwined with the merits of the case.  If, for example, State Farm is found to have made its first three autodialed calls in reasonable reliance on Betancourt's negligent misrepresentation (causing a total of $1,500 in statutory damages, or $4,500 if willful), but hundreds more calls were made in spite of a subsequent revocation of consent, then spending $132,000 to defend a claim with a maximum potential recovery of only $4,500 would appear unreasonable.  This issue will thus require consideration by the district court on remand.

## V.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the district court's grant of summary judgment to State Farm on Osorio's TCPA claim, **REVERSE** its grant of summary judgment to State Farm on the latter's negligent-misrepresentation claim against Betancourt, and **REMAND** the case for further proceedings consistent with this opinion.