[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 19-15072

_____

AUTAUGA COUNTY EMERGENCY MANAGEMENT
COMMUNICATION DISTRICT,
CALHOUN COUNTY 911 DISTRICT,
BIRMINGHAM      EMERGENCY      COMMUNICATIONS
DISTRICT,
MOBILE COUNTY COMMUNICATIONS DISTRICT,

Petitioners,

versus

FEDERAL COMMUNICATIONS COMMISSION,

Respondent,

ATT,

BELLSOUTH,

Intervenors-Respondents.

———————————

Petition for Review of a Decision of the
Federal Communications Commission
Agency No. 19-FCC-44

———————————

Before ROSENBAUM, LUCK, and ANDERSON, Circuit Judges.

ROSENBAUM, Circuit Judge:

Dialing 9-1-1 from anywhere in the United States, using just about any type of phone system, connects a user with an emergency-services hotline. That, of course, is by design.

The groundwork for our national emergency-system hotline started to be laid in the 1960s. Since that time, new telephony technology continued to develop: basic analog systems, digital systems, mobile and cellular systems, and most recently, systems that use the internet to transmit messages. This internet telephony

technology is often referred to as "Voice over Internet Protocol," or "VoIP," for short.[1]  And Congress took notice of it.

Indeed, in 2008, Congress enacted legislation that required the development of a "national plan for migrating to a national IP-enabled emergency network capable of receiving and responding to all citizen-activated emergency communications and improving information sharing among all emergency response entities."  47

---

[1] To understand how VoIP functions, it's helpful to compare it to how conventional phone calls work.  A "regular" phone call using the "public switched telephone network" ("PSTN") (also known by the retronym "plain old telephone service" ("POTS")) relies on circuit-switched telephony.  *See* ThinkSecure Network, *How does a VoIP phone system work differently than POTS?*, *Difference Between VoIP and PSTN*, ThinkSecureNet (June 11, 2021), https://www.thinksecurenet.com/blog/how-does-a-voip-phone-system-work-differently-than-pots/.  The system works by setting up a dedicated circuit between two points at different sites for the duration of a call.  *See* Cameron Johnson, *What is POTS? Plain Old Telephone Service Line & Network Explained*, Nextiva Blog (Oct. 15, 2018), https://www.nextiva.com/blog/what-is-pots.html.  Traditionally, this type of telephony system has used copper wires carrying analog voice data over dedicated circuits.  *Id.*  In more recent years, integrated services digital network ("ISDN") technology has been used to carry digital voice data, using the traditional public switched telephone network.  *Id.*  In contrast, VoIP refers to phone service over the internet.  *See Difference Between VoIP and PSTN*, GeeksforGeeks (updated on Aug. 14, 2020), https://www.geeksforgeeks.org/difference-between-voip-and-pstn/.  For calls using VoIP, the internet is the transmission medium for voice data in the form of packets using Internet Protocol ("IP").  *Id.*  VoIP transmits real-time voice signals from a source IP address to the target IP address.  *Id.*  VoIP has come a long way since its invention, and today, some consider it more reliable and cost-effective than good, old-fashioned POTS.  *Id.*

4                    Opinion of the Court                    19-15072

U.S.C. § 942(d)(1) (2008).   That legislation is called the New and Emerging Technologies 911 Improvement Act of 2008 ("NET 911 Act"), Pub. L. 110-283, 122 Stat. 2620 (July 23, 2008), and it is codified at 47 U.S.C. §§ 222, 615a, 615a-1, 615b and 942.[2]

Congress identified three interrelated purposes of the NET 911 Act:   "To promote and enhance public safety by facilitating the rapid deployment of IP-enabled 911 and E-911 services, encourage the Nation's transition to a national IP-enabled emergency network, and improve 911 and E-911 access to those with disabilities." Pub. L. 110-283, 122 Stat. 2620.

In furtherance of these purposes, Congress legislated "parity" between VoIP-based and non-VoIP-based providers and subscribers when it comes to providing and obtaining 911-system access.   Put simply, Congress sought to eliminate any financial penalty to VoIP providers and subscribers, in comparison to non-VoIP providers and subscribers, for 911-system access.

As part of this plan, Congress enacted 42 U.S.C. § 615a-1(f)(1), which we refer to as the "911 Fee Parity Provision."   This statute allows non-federal government entities to charge a fee to commercial phone services for the support or implementation of various 911 services.   But it specifies that, "[f]or each class of

---

[2] Section 942 has since been substantially amended by the Next Generation 9-1-1 Advancement Act of 2012, Pub. L. 112-96, §§ 6501-09, 126 Stat. 156, 237-45 (Feb. 22, 2012).   For that reason, our further citations of Section 942 in this opinion refer to the 2008 version.

subscribers to IP-enabled voice services, the fee or charge may not exceed the amount of any such fee or charge applicable to the same class of subscribers to telecommunications services." *Id.*

Appellants here are four 911 Districts in Alabama who contend that the 911 Fee Parity Provision authorizes them to charge non-VoIP and VoIP service providers using a different unit of measure for each, as long as the Districts apply the same base fee for each unit. For example, the 911 Districts argue that they may charge non-VoIP service providers per access line and VoIP service providers per ten-digit telephone number as long as they charge, say, $1.00 each for both units—even if the total charges for a given class of VoIP subscribers exceed the total charges for the same class of non-VoIP subscribers for the same amount of burden each group of subscribers imposes on the 911 system.

Asserting that Intervenor BellSouth failed to pay the fee for each ten-digit number, the 911 Districts filed suit against BellSouth in district court. BellSouth disagreed that it was required to pay these fees.

Under the primary-jurisdiction doctrine, the district court referred the matter to the Federal Communications Commission (the "Commission"), since the Commission was charged with executing and enforcing the provisions of the NET 911 Act, *see* 47 U.S.C. § 151. After receiving comments, the FCC issued a declaratory ruling concluding that the 911 Fee Parity Provision prohibits state and local governments from charging 911 fees to VoIP providers that are greater than those charged to non-VoIP providers

for the same amount of burden the services impose on the 911 system. The effect of that order would preclude the 911 Districts from charging VoIP providers and non-VoIP providers the same base fee based on different units if the total fee charged for comparable 911 access is higher for VoIP service providers. The 911 Districts now challenge that ruling on a petition for review.

After careful consideration and with the benefit of oral argument, we independently arrive at the same conclusion as the FCC. We base our determination on congressional intent as expressed in the statutory text, structure, and purpose of the NET 911 Act. Because Congress's intent is unambiguous, we deny the 911 Districts' petition for review.

I.

A.    Factual Background

1.    History of 911

Just three presses of a button on any telephone—9-1-1—request emergency assistance in the United States. Dialing 911 automatically links the caller to a nearby "public safety answering point," (referred to in the U.S. Code as "PSAP," *see* 47 U.S.C. § 615b(3)) where a trained telephone operator can dispatch emergency responders such as police, firefighters, and ambulance services directly to the caller's location. Better yet, today, in most parts of the country, the 911 system automatically provides the dispatcher with the caller's location and phone number.

But things weren't always this way. Before the designation of 911 as the nationwide three-digit emergency-call number, individuals needed to know and dial local phone numbers to reach their nearby police or fire station in case of emergency. Or they could dial "0" to reach a telephone-company operator, who would then have to transfer the call. But unlike the emergency dispatchers who are now trained for their specific positions, general telephone operators weren't necessarily equipped or taught to perform emergency-call-assistance services.

By the mid-1950s, people started to recognize that this system was inadequate to meet the emergency communication needs of the public. In 1957, for example, the National Association of Fire Chiefs reportedly suggested the need for a single telephone number for reporting fires. *See History of 911: And What it Means for the Future of Emergency Communications*, iCERT and 911 Education Foundation, https://static.wixstatic.com/ugd/b8d2ce_e6b60db90b47454dbb047f451278aa66.pdf.

And ten years later, in 1967, President Lyndon B. Johnson's Commission on Law Enforcement and Administration of Justice recommended that citizens be able to contact police departments using a uniform telephone number. *Id.* Its report stated, "Wherever practical, a single police telephone number should be established, at least within a metropolitan area and eventually over the entire United States . . ." *Id.* To make that vision a reality, in November 1967, the Federal Communications Commission met with the American Telephone and Telegraph Company ("AT&T")—

the provider of telephone service throughout most of the United States at that time—to find a means of establishing a universal emergency number that could be implemented quickly.

Two months later, on January 12, 1968, AT&T announced its designation of 911 as the universal emergency number. *Id.* Why those digits? According to the National Emergency Number Association ("NENA"), 911 was "brief" and "easily remembered," and because it was "a unique number, never having been authorized as an office code, area code, or service code," "it best met the long range numbering plans and switching configurations of the telephone industry." *See 9-1-1 Origin & History*, NENA The 9-1-1 Association, https://www.nena.org/page/911overviewfacts (last visited Oct. 26, 2021). On February 16, 1968, Alabama's state Speaker of the House Rankin Fite completed the first ever 911 call to Tom Bevill, a U.S. Representative, in Haleyville, Alabama, who was sitting at the police station, waiting to inaugurate the new system. *See Haleyville – The First 911 Call*, http://archives.ubalt.edu/bsr/articles/feb%2016.pdf.

### 2.    Statutory regulation of 911

Fast forward to 1999 and the new age the cell-phone rang in: Congress directed the Federal Communications Commission to designate 911 as the nationwide emergency hotline for wireline and wireless voice services. *See* Wireless Commc'ns and Pub. Safety Act of 1999, Pub. L. 106-81, § 3(a), 113 Stat. 1286, 1287 (Oct. 26, 1999) (codified at 47 U.S.C. § 251(e)(3)). Since that time, the

19-15072                Opinion of the Court                    9

Commission has issued numerous orders overseeing and regulating the nation's 911 emergency call system.[3]

And then, the internet took off.[4] After 2000, with the proliferation of new technologies and the growing popularity of voice

---

[3] *See, e.g., In the Matter of Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems*, Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 18676, 18678, ¶1 (1996) ("today we are taking several important steps to foster major improvements in the quality and reliability of 911 services" in furtherance of "our longstanding and continuing commitment to manage use of the electromagnetic spectrum in a manner that promotes the safety and welfare of all Americans"); *In the Matter of Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems; Amendment of Parts 2 and 25 to Implement Global Mobile Personal Communications by Satellite (GMPCS) Memorandum of Understanding and Arrangements; Petition of the National Telecommunications and Information Administration to Amend Part 25 of the Commission's Rules to Establish Emissions Limits for Mobile and Portable Earth Stations Operating in the 1610-1660.5 MHz Band*, Report and Order and Second Further Notice of Proposed Rulemaking, 18 FCC Rcd 25340, 25341, ¶1 (2003) ("we revise the scope of our enhanced 911 rules to clarify which technologies and services will be required to be capable of transmitting enhanced 911 information to public safety answering points"). Enhanced 911 ("E911") service, in contrast with the original basic 911, routes emergency calls to a geographically appropriate public safety answering point based on the caller's location, provides the caller's call-back number and, in many instances, the caller's location. To keep things simple, we refer to basic 911 and E911 collectively as "911" unless otherwise noted.

[4] *See* Anne Hyland, *How the internet changed everything*, Australian Financial Review (Apr. 14, 2015), https://www.afr.com/life-and-luxury/how-the-internet-changed-everything-20150306-13x619.

calls made online using VoIP technology, the Commission initiated a rulemaking proceeding to explore the impact that internet and VoIP services "have had and will continue to have on the United States' communications landscape." *In the Matter of IP-Enabled Services*, Notice of Proposed Rulemaking, 19 FCC Rcd 4863, 4864, ¶ 1 (2004). Relevant here, the Commission specifically sought comment "on the potential applicability of 911, E911, and related critical infrastructure regulation to VoIP and other IP services." *See id.*, 19 FCC Rcd at 4898-99, ¶ 53.

In 2005, the Commission adopted rules "requiring providers of interconnected voice over Internet Protocol (VoIP) service to supply enhanced 911 (E911) capabilities to their customers." *In re IP-Enabled Servs. & E911 Requirements for IP-Enabled Serv. Providers*, 20 F.C.C.R. 10245, 10246 (2005). These rules define "interconnected Voice over Internet protocol (VoIP) service" as "a service that: (i) Enables real-time, two-way voice communications; (ii) Requires a broadband connection from the user's location; (iii) Requires internet protocol-compatible customer premises equipment (CPE); and (iv) Permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network." 47 C.F.R. § 9.3. We refer to these rules as the "2005 VoIP 911 Order."

In 2008, Congress followed suit by enacting the New and Emerging Technologies 911 Improvement Act of 2008 ("NET 911 Act"), Pub. L. 110-283, 122 Stat. 2620 (July 23, 2008). That law, which codified the rules set forth in the 2005 VoIP 911 Order,

directed that it "shall be the duty of each IP-enabled voice service provider to provide 9-1-1 service and enhanced 9-1-1 service to its subscribers in accordance with the requirements of the . . . Commission."  47 U.S.C. § 615a-1(a).

As we have noted, the statute also preserved the ability of states and other jurisdictions to impose fees on these types of services to assist in supporting the 911 emergency-hotline system.  In so doing, the Act required that any fees charged be used exclusively "in support of 9-1-1 and enhanced 9-1-1 services, or enhancements of such services" as the state or local law authorizing the fees specified, and it directed that the fee for "each class of subscribers to [VoIP] services" not exceed that for "the same class of subscribers to telecommunications services":

> Nothing in this Act, the Communications Act of 1934 (47 U.S.C. 151 et seq.), the New and Emerging Technologies 911 Improvement Act of 2008, or any Commission regulation or order shall prevent the imposition and collection of a fee or charge applicable to commercial mobile services or IP-enabled voice services specifically designated by a State, political subdivision thereof, Indian tribe, or village or regional corporation serving a region established pursuant to the Alaska Native Claims Settlement

> Act, as amended (85 Stat. 688)[,] for the
> support or implementation of 9-1-1 or
> enhanced 9-1-1 services, provided that
> the fee or charge is obligated or ex-
> pended only in support of 9-1-1 and en-
> hanced 9-1-1 services, or enhancements
> of such services, as specified in the pro-
> vision of State or local law adopting the
> fee or charge.  For each class of subscrib-
> ers to IP-enabled voice services, the fee
> or charge may not exceed the amount of
> any such fee or charge applicable to the
> same class of subscribers to telecommu-
> nications services.

*Id.* § 615a-1(f)(1).

## B.    Procedural Background

### 1.    The district-court lawsuit

On May 6, 2015, BellSouth Telecommunications, LLC, filed a notice of removal in the United States District Court for the Northern District of Alabama, relating to a complaint three 911 emergency-communications districts—those for Autauga County, Calhoun County, and Birmingham—filed in state court.

In an amended complaint, the 911 Districts—now including the communications district for Mobile County as well (we refer to the four 911 emergency-communications districts collectively as

the "911 Districts")—alleged that they provide their districts with 911 services, which are funded by emergency telephone service charges. They further asserted that BellSouth did not collect the proper charges from VoIP customers as required under Alabama's Emergency Telephone Service Act ("ETSA"), Ala. Code § 11-98-1, *et seq.* (effective until Oct. 1, 2013). More specifically, the complaint contended that, between 2005 and 2013, BellSouth failed to correctly bill its business VoIP customers for emergency telephone service fees, and it misapplied a cap on 911 charges.

Initially, ETSA had imposed a 911 charge on service providers for every "exchange access line" up to a cap of 100 "per person, per location." Ala. Code § 11-98-5. But in 2005, Alabama amended ETSA to require VoIP providers to instead bill one "fee for each 10-digit access number assigned to the [VoIP] user." *Id.* at § 11-98-5.1. It was these fees that the 911 Districts claimed BellSouth had failed to properly pay. As later became apparent during the course of the litigation (and for reasons we explain more below), this difference in the way that VoIP and non-VoIP subscribers were to have their 911 fees assessed was significant because it would result in higher total charges to the VoIP subscribers for the same ability of the VoIP and non-VoIP subscribers to reach 911 at any given time.[5]

---

[5] During the course of the litigation through the district court and the Commission, Bellsouth actually explained its refusal to charge and collect the fees per telephone number based on the position that the services it provided were not VoIP services as that term is defined for purposes of the fee but were

14                    Opinion of the Court                    19-15072

The 911 Districts sought in five counts to recover these allegedly unpaid charges: (1) under ETSA, (2) for negligence, negligence per se, gross negligence, and recklessness, (3) for breach of fiduciary duty, (4) for wantonness, and (5) for negligent misrepresentation and fraud.

BellSouth moved to dismiss for failure to state a claim, arguing that the factual allegations of the complaint were too conclusory and the common-law claims failed as a matter of law. The court denied the motion.

Then BellSouth filed a motion to refer two issues relating to the litigation to the Commission under the primary-jurisdiction doctrine.[6] That doctrine allows a court to "stay an action pending

---

instead traditional telephone services. Because that issue is not before us on appeal, we do not discuss it further.

[6] The two issues BellSouth sought to have the Commission consider are not the issues the Commission ultimately decided to address, so they are not before us in this appeal. For that reason, though we note those issues for the sake of completeness, we do not pause to explain the technological details of them and how those technological aspects are relevant to the issues raised. The two issues included the following:

> Whether a traditional voice service, such as Integrated Services Digital Network ("ISDN") Primary Rate Interface ("PRI"), that does not utilize Internet Protocol to transmit voice communications to or from the customer's premises is nonetheless interconnected Voice-over-Internet-Protocol ("VoIP") service when provisioned over fiber-optic facilities to a

19-15072              Opinion of the Court                  15

resolution of an issue that falls within the special competence of an administrative agency." *Beach TV Cable Co. v. Comcast of Fla./Ga., LLC*, 808 F.3d 1284, 1288 (11th Cir. 2015). BellSouth's motion also sought a stay of the district-court proceedings while the Commission addressed the issues BellSouth sought to refer. The 911 Districts opposed the motion. They argued that the case involved a state-law dispute over which the Commission had no say.

But the district court did not agree with the 911 Districts, and it granted the motion for referral. In its order, the court noted that the parties disagreed about how to characterize the claims in the case and about the claims' relation to the communications technologies at issue. Although the court referred the matter to the Commission "for further guidance," it did not explicitly adopt BellSouth's framing of the issues, nor did it otherwise specify the issues it was referring to the Commission.

The district court proceedings remain stayed pending this appeal.

---

customer that also has IP-compatible customer premises equipment ("CPE").

Whether 47 U.S.C. § 615a-1(f)(1) preempts Ala. Code § 11-98-5.1(c) insofar as it requires customers of VoIP or similar services to pay a charge that exceeds the 911 charges applicable to the same class of subscribers to traditional voice services.

### 2.    The administrative proceeding

After the referral to the Commission, the 911 Districts and BellSouth filed cross-petitions for declaratory ruling with the Commission.  The Commission released a public notice seeking comment on the petitions.

Once the Commission considered the comments it received, it issued its declaratory ruling.  To explain the ruling, we must pause to explain the concept of call capacity.  Call capacity refers to the number of concurrent calls a business's communications system can handle at any one time.  *See How much call capacity does your business need?*, Bandwidth (Sept. 17, 2020), https://www.bandwidth.com/blog/how-much-call-capacity-does-your-business-need/.  A business that employs 100 people, for example, may wish to assign each employee her own phone number, and it may wish to have additional phone numbers for departments or other aspects of the business.  Besides allowing direct contact with those outside the business, this type of setup also permits internal employee-to-employee communications.  But most businesses of this size will not require a communications system that will allow all 100 employees to be on external phone calls at the same time.  Modern phone-communications services are able to offer such business customers telecommunications services that suit their needs without providing them with the capacity for each of their assigned phone numbers to be in use concurrently.  *See id.*

Here's why the concept of concurrent calling capacity is important:  Under Alabama's ETSA provision, the 911 Districts took

a position that the 911 Fee Parity Provision required only that the absolute base 911 fees they charged non-VoIP and VoIP service providers be the same, regardless of the systems' concurrent call capacity. This construction would allow the 911 Districts to charge 911 fees per access line to non-VoIP customers but per phone number to VoIP customers, as long as the base fee amount charged was the same for each. A fee structure like this would result in higher total charges on VoIP customers than on non-VoIP customers.

To understand why, consider a VoIP and non-VoIP customer that each bought ten access lines capable of outbound calling and that each obtained twenty telephone numbers for internal communications between the employees. If the fee were $1.00 per access line for a non-VoIP customer and $1.00 per assigned telephone number for a VoIP customer, the absolute base fee charged to customers of both types of services—$1.00—would be the same. But the non-VoIP customer would be charged a total of $10.00 ($1.00 times 10 access lines), while the VoIP customer would have to pay $20.00 ($1.00 times 20 individual phone numbers) for the same concurrent outbound call capacity. As a result, if a customer switched from a non-VoIP telecommunications service to a VoIP one with the same concurrent outbound calling capacity and the same number of individual phone numbers, BellSouth asserted that such a customer would "see its monthly telephone bill increase substantially."

With that basic understanding, we return to the order the Commission issued in response to the district court's referral. The

Commission's order interpreted the 911 Fee Parity Provision, 47 U.S.C. § 615a-1(f)(1), to "prohibit[] non-federal governmental entities from imposing 911 fees or charges on VoIP services in any manner that would result in a subscriber to such VoIP services paying a total amount of 911 fees or charges that exceeds the total amount of 911 fees or charges that the same subscriber would pay for a traditional telecommunications service with the same 911 outbound calling capability or same quantity of units upon which 911 fees are imposed for traditional telecommunications services."

In other words, the oranges-to-oranges comparison the Commission's interpretation of § 615a-1(f)(1) requires is based on the unit of outbound concurrent calling capacity—effectively, the same ability to burden 911 services at any point in time—not the base fee. So under this construction, the number of phone numbers a VoIP customer has is necessarily irrelevant to the maximum amount the VoIP customer may be charged if it is not possible for the VoIP customer to use all its phone numbers simultaneously to call 911. Rather, both VoIP and non-VoIP customers may be charged the 911 fee for only as many numbers as they have the ability to simultaneously use to call 911. So VoIP and non-VoIP customers pay the same total 911 fee for the same maximum concurrent call capacity, without respect to how the system is configured.

Beyond this, though, the Commission declined to rule further on the specific arguments the parties raised in the district-court

proceeding, including whether the 911 Fee Parity Provision preempted ETSA.

The 911 Districts now appeal the Commission's Order directly to us under the Hobbs Act, 28 U.S.C. § 2342, which endows federal courts of appeals with "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" Commission rulings. *See Mais v. Gulf Coast Collection Bureau, Inc.,* 768 F.3d 1110, 1113 (11th Cir. 2014) ("In the Hobbs Act, 28 U.S.C. § 2342, Congress unambiguously deprived the federal district courts of jurisdiction to invalidate FCC orders by giving exclusive power of review to the courts of appeals."). In particular, the Hobbs Act authorizes us to review orders "adopted by the Commission in the avowed exercise of its rule-making power" and that "affect or determine rights generally." *Id.* at 1121 (citing *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 417 (1942)).

By the terms of the Hobbs Act, the 911 Districts' appeal is against the Commission. *See* 28 U.S.C. § 2344 ("The action shall be against the United States."). For its part, BellSouth has intervened as an interested party, as have two trade groups—USTelecom (The Broadband Association) and NCTA (The Internet and Television Association)—to defend the Commission's interpretation of the 911 Fee Parity Provision.

## II.

Under the Hobbs Act, when we conduct our review, we apply the standards from the Administrative Procedure Act ("APA").

*See RTC Transp., Inc. v. I.C.C.*, 708 F.2d 617, 619 (11th Cir. 1983). The APA, in turn, requires us to set aside "agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2), (2)(A). This deferential standard seeks only a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S 29, 43 (1983) (citation and internal quotation marks omitted). Our sole mission in conducting a review under this standard, then, "is to ensure that the agency came to a rational conclusion." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (citation and internal quotation marks omitted).

## III.

In reviewing the FCC's construction of a statute that it administers, we apply the two-step process that *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984), sets forth. *See Nat'l Ass'n of State Util. Consumer Advocs.*, 457 F.3d 1238, 1253 (11th Cir. 2006). At *Chevron*'s first step, we evaluate "whether Congress has spoken to the precise question at issue." *Id.* (quoting *Chevron*, 467 U.S. at 842). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43; *cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (before deferring to an agency's reading of its own ambiguous regulation, a court must "carefully consider the text,

structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on").

But if, after employing all the "traditional tools of statutory construction," *Chevron*, 467 U.S. at 842 n.9, the statute remains genuinely ambiguous on the specific issue, we proceed to *Chevron*'s second step, *id.* at 843. There, we ask "whether the agency's answer is based on a permissible construction of the statute." *Id.*

We start with *Chevron* step one. First, we must identify the specific question we seek to answer. Here, that question asks whether the 911 Fee Parity Provision permits a non-federal government entity to charge a given class of VoIP subscribers a higher total 911 fee than the same class of non-VoIP subscribers for the same concurrent call capacity if the entity uses the same base fee but different units of measurement to assess the fees. As we explain below, we conclude that it does not. The 911 Fee Parity Provision precludes any unit of measurement that results in higher total fees for VoIP subscribers than for non-VoIP subscribers with the same outbound concurrent call capacity.

As we've mentioned, we ascertain congressional intent by employing the "traditional tools of statutory construction" *id.* at 843 n.9, as we examine the text of the statute, its structure, its history, and its stated purpose, *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1215 (11th Cir. 2015); *cf. Kisor*, 139 S. Ct. at 2423-24 (explaining that exhausting all the tools in the regulatory-construction context requires a court to "make a

conscientious effort to determine [the meaning of the regulation], based on indicia like text, structure, history, and purpose").

Starting with the text of the statute, "we presume that Congress said what it meant and meant what it said." *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002) (en banc). We focus initially on the last sentence of Section 615a-1(f)(1). It states, "For each class of subscribers to IP-enabled voice services, the fee or charge may not exceed the amount of any such fee or charge applicable to the same class of subscribers to telecommunications services." 47 U.S.C. § 615a-1(f)(1).

Our first clue comes from the structure of the sentence: here, the prepositional phrase "For each class of subscribers to IP-enabled voice services" contextualizes the rest of the sentence. So in comparing whether the fees for VoIP subscribers and for the same class of non-VoIP subscribers is the same, we consider what the fee is from the perspective of "each class of subscribers to IP-enabled voice services."

Keeping that in mind, we move on to the phrase "imposition and collection" that appears in an earlier sentence in the provision: "Nothing [in the relevant congressional Acts and Commission actions] shall prevent the *imposition and collection* of a fee or charge applicable to commercial mobile services or IP-enabled voice services . . . ." 42 U.S.C. § 615a-1(f)(1) (emphasis added). "And" means "[t]ogether with or along with; in addition to; as well as." *And*, The American Heritage Dictionary of the English Language, at 66 (4th ed. 2000). So the use of "and" in the phrase "imposition and

collection" requires that the "fee or charge" be the same for subscribers to VoIP services and subscribers to non-VoIP services for both any 911-related fee the 911 Districts impose on and any 911-related fee they collect from those classes of subscribers.  In other words, to the extent that a fee-assessment method causes the fee imposed on VoIP and non-VoIP subscribers to be the same but the fee collected from VoIP and non-VoIP subscribers to be different, that fee-assessment method would not satisfy the 911 Fee Parity Provision.  Putting that together with the sentence's focus on the perspective of "each class of subscribers to IP-enabled voice services," we know that both the fee imposed on and the fee collected from VoIP subscribers must not exceed the fee for the same class of non-VoIP subscribers.

Next, we look at the word "collection."  "To collect" means "[t]o bring together in a group or mass; gather."  *Collect*, The American Heritage Dictionary of Language, at 362 (4th ed. 2000).  Though it also means "[t]o call for and obtain payment of," *id.*, in the context of § 615a-1(f)(1)—which indicates that "collection" is in association with a "fee or charge" on "class[es] of subscribers to IP-enabled voice services"—we understand "collection" here to refer to the total fees or charges imposed on a given "class of subscribers to IP-enabled voice services."

The word "amount" that appears in the last sentence of the 911 Fee Parity Provision similarly supports that conclusion.  "Amount" means "[t]he total of two or more quantities; the aggregate."  *Amount*, The American Heritage Dictionary of the English

Language, 61 (4th ed. 2000). So in this context, we read a limitation on the amount of fees collected as a limitation on the aggregate of the fees collected. Given our directed perspective, this means we must consider, from the point of view of any "class of subscribers to IP-enabled voice services," the *total* of the fees imposed or collected.

Having put certain terms within Section 615a-1(f)(1) under the microscope, we zoom out now for a bird's eye view of the entire provision and consider how these terms fit into it. While the last sentence emphasizes ensuring that fees for VoIP subscribers don't exceed fees for non-VoIP subscribers, the rest of Section 615a-1(f)(1) addresses what the "fee[s] or charge[s]" are for: "the support or implementation of 9-1-1- or enhanced 9-1-1 services." So the point of the 911 Fee Parity Provision, then, is to ensure that VoIP and non-VoIP subscribers financially support 911 facilities to the same extent that they burden the hotline service.

Of course, since 911 is a phone service, it can be burdened only to the extent that phones are able to reach it. As a result, maximum concurrent call capacity—the greatest number of individual phone numbers, assigned to a single user, that can simultaneously make an outbound call to 911—is necessarily the unit that measures the amount of burden a user imposes, regardless of the number of individual phone numbers a user may have. For that reason, we think the text of Section 615a-1(f)(1) requires that any 911 fees non-governmental entities impose and collect must be based on maximum concurrent call capacity.

The 911 Districts disagree.  They argue that the 911 Fee Parity Provision requires only that the base fee—think $1.00 from our example where the non-federal government entity charges VoIP customers $1.00 per individual telephone number and non-VoIP customers $1.00 per access line—not the total fee, for VoIP and non-VoIP subscribers be the same.  The 911 Districts base their argument primarily on the words "fee" and "charge."  We are not persuaded.

First, the 911 Districts observe that the last sentence of Section 615a-1(f)(1) uses the singular form of "fee" and "charge."  By employing the singular form, the 911 Districts insist, Congress intended to regulate only the base fee, not the total fees imposed.  In further support of this position, the 911 Districts rely on the dictionary definition of "fee": "a fixed charge."  Appellants' Br. at 13 (quoting *Fee*, Merriam-Webster Dictionary (online ed.), https://www.merriam-webster.com/dictionary/fee).  They say that for a "fixed charge" to be the same, it necessarily must reflect the base fee or charge because "[o]nce the assessable units are considered, the fee is no longer a "fixed charge."  Rather, the 911 Districts reason, it changes depending on the number of assessable units.

But 1 U.S.C. § 1 provides that when we determine the meaning of any Act of Congress, "unless the context indicates otherwise—words importing the singular include and apply to several persons, parties, or things."  Here, the 911 Districts identify no basis for finding that "the context indicates otherwise."  Nor are we

aware of any.  To the contrary, and as we have noted above and explain further below, we conclude the opposite.

In further support of their theory that "fee" refers to a base fee and not the total fees, the 911 Districts argue that the Commission's own use of the word "fee" shows that it understands the word to refer to the base fee.  In support of this contention, the 911 Districts point out that the Commission prepares an annual report to Congress, under the NET 911 Act.  *See* 47 U.S.C. § 615a-1.  In that report, the 911 Districts note, the Commission includes a chart of each reporting jurisdiction's "fee," and it lists the base fee of each reporting jurisdiction.  From this, the 911 Districts conclude that the Commission's own usage of the word "fee" shows that it understands the word to mean the base fee, not the aggregate fee.  Similarly, the 911 Districts invoke state statutes' use of the terms "fee" and "charge" to support their position that that "the common usage" of those terms "in the singular represents the base fee or rate."  Appellant's Br. at 14.

But even assuming the Commission's use of the word "fee" in its NET 911 Act reports somehow necessarily means that the Commission understands the word "fee" in subsection 615a-1(f)(1) to mean solely base fee—a position that is contradicted by the very reason this case is on appeal—that does not bear on our independent duty at Chevron's first step to discern the plain meaning of the statute, regardless of what the Commission may think.  Nor have the 911 Districts identified any reason to think that Congress meant to incorporate state usage into a provision of federal law intended

to limit state authority to impose 911 fees.  And neither the Commission's use of "fee" in its NET 911 Act report charts nor the states' use of "fee" in their respective statutes, in any case, even purports to account for the rest of the statutory text of subsection 615a-1(f)(1)—especially the subsection's goal of ensuring VoIP subscribers not pay more than non-VoIP subscribers for imposing the same burden on the 911 system.

Besides the language of the 911 Fee Parity Provision, the structure of the NET 911 Act also suggests that subsection 615a-1(f)(1) seeks to equalize the aggregate fees VoIP and non-VoIP subscribers must pay to support the 911 system, based on the burden they place on it.  Indeed, the NET 911 Act's structure reflects repeatedly its goal of ensuring equality of access to and financial responsibility for 911 benefits and burdens, between VoIP and non-VoIP subscribers, as it relates to the nation's phone systems.  For example, Section 615a is specifically entitled, "Service provider parity of protection."  Within that section, three of the subsections also refer to parity:  "Provider parity," § 615a(a); "User parity," § 615a(b); and "PSAP parity,"[7] § 615a(c).  All these sections ensure that VoIP providers and subscribers shall not receive lesser benefits or access to 911 service than non-VoIP providers and subscribers.

And within Section 615a-1, subsection (b) is entitled, "Parity for IP-enabled voice service providers."  That subsection requires those with control over capabilities to provide 911 and enhanced

---

[7] As a reminder, "PSAP" refers to "public safety answering point."

911 service to offer those capabilities to VoIP service providers "on the same rates, terms, and conditions" that they do for non-VoIP service providers.

All these parity provisions make even more sense in the broader context of the NET 911 Act. Section 942, when amended by the Act, required the development of a "national plan for migrating to a national IP-enabled emergency network capable of receiving and responding to all citizen-activated emergency communications and improving information sharing among all emergency response entities." 47 U.S.C. § 942(d)(1) (2008). If providers of and subscribers to VoIP services had to pay more in fees than providers of and subscribers to non-VoIP services for the same access to the 911 hotline, that would place obstacles in the path of updating the nationwide 911 system. In short, the structure of the Act suggests overall congressional intent that VoIP service providers and subscribers not be penalized financially merely because they use VoIP technology, as opposed to non-VoIP technology.

Next—and in this case, finally—we consider the NET 911 Act's purpose:  "[t]o promote and enhance public safety by facilitating the rapid deployment of IP-enabled 911 and E-911 services, encourage the Nation's transition to a national IP-enabled emergency network, and improve 911 and E-911 access to those with disabilities." Pub. L. 110-283, 122 Stat. 2620. As we have explained, the 911 Districts' reading of the 911 Fee Parity Provision to allow the imposition of higher total fees on VoIP subscribers than on non-VoIP subscribers, as long as the base fee is the same, would

create a financial disincentive to potential VoIP providers and subscribers alike to invest in VoIP services. Contrary to Congress's stated desire to "facilitate[e] the *rapid* deployment of IP-enabled 911 . . . services," *id.* (emphasis added), the 911 Districts' proposed reading of the 911 Fee Parity Provision would disincentivize—and therefore delay—transition to VoIP services. That reading, of course, would impede Congress's stated purpose in enacting the Net 911 Act.

In sum, the "text of the statute, its structure, and its stated purpose" all direct a clear reading of the 911 Fee Parity Provision: the statute demands parity in the total fees assessed on VoIP and non-VoIP subscribers for 911 hotline services. Because the statute, its structure, and its stated purpose yield an incontrovertible answer, we need not also consult the legislative history here. For the same reason—"the intent of Congress is clear[—]that is the end of the matter," and we do not proceed to *Chevron* step two. And so we find no reason to set aside the Commission's decision as arbitrary, capricious, or contrary to law.

## IV.

For these reasons, we deny the petition for review.

**PETITION DENIED; ORDER AFFIRMED.**