[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10277

_____

INSURANCE MARKETING COALITION LIMITED,

Petitioner,

*versus*

FEDERAL COMMUNICATIONS COMMISSION,
UNITED STATES OF AMERICA,

Respondents.

_____

Petition for Review of a Decision of the
Federal Communications Commission
Agency No. CG-02-278 / CG-17-59 / CG-21-402

_____

Before BRANCH, LUCK, and LAGOA, Circuit Judges.

BRANCH, Circuit Judge:

Under the Telephone Consumer Protection Act ("TCPA"), those wishing to make a robocall must obtain the called party's "prior express consent."  47 U.S.C. § 227(b)(1)(A), (B).  An existing regulation promulgated by the FCC in 2012 states that "prior express consent" means "prior express *written* consent" when the robocall at issue constitutes telemarketing or advertising.  47 C.F.R. § 64.1200(a)(2), (3) (emphasis added); *In the Matter of Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1831 (2012) ("2012 Order").[1]

At issue here is another sweeping rule affecting only telemarketing and advertising robocalls and robotexts.[2]  Like it did in 2012, in 2023, the FCC promulgated a legislative rule interpreting the phrase "prior express consent" as used in the TCPA.  *See* Second Report and Order, *In the Matter of Targeting and Eliminating Unlawful Text Messages, Rules and Reguls. Implementing*

---

[1] The 2012 Order is not at issue in this case.

[2] We use the terms "robocalls" and "robotexts" as shorthand for calls and texts made "using any automatic telephone dialing system or an artificial or prerecorded voice"—*i.e.*, the calls and texts that the TCPA regulates.  *See* 47 U.S.C. § 227(b)(1)(A), (B).  We note that even though the statute on its face does not mention text messages, the FCC—by regulation—has interpreted the word "call" to include text messages.  *See In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 (2003).  For the ease of the reader, this opinion primarily uses the term "robocalls" as a shorthand for "robocalls and robotexts."

*the Tel. Consumer Prot. Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, 38 FCC Rcd. 12247, 12258–69 (2023) ("2023 Order").  Part III.D of the 2023 Order states, categorically, that a consumer cannot consent to a telemarketing or advertising robocall unless (1) he consents to calls from only one entity at a time, and (2) he consents only to calls whose subject matter is "logically and topically associated with the interaction that prompted the consent."  *Id.* at 12297.  These two restrictions apply regardless of any other facts bearing on one's consent in a particular case. *See id.*

Petitioner Insurance Marketing Coalition Limited ("IMC") challenges Part III.D of the FCC's 2023 Order on three grounds.[3] First, IMC contends that the FCC exceeded its statutory authority in issuing the 2023 Order.  IMC makes two arguments in support. It first argues that the 2023 Order impermissibly interprets the phrase "prior express consent" to mean "two different things." That is, IMC asserts that the FCC improperly differentiated between telemarketing and advertising calls, on one hand, and non-telemarketing and non-advertising calls, on the other, in promulgating the two restrictions.  IMC also argues that the two restrictions conflict with the ordinary statutory meaning of "prior express consent."

Second, IMC contends that the 2023 Order violates the First Amendment by "impos[ing] content-based discrimination on

---

[3] Because IMC challenges only Part III.D of the 2023 Order, we address only that part.  All references to the 2023 Order refer to Part III.D.

marketing calls" without proper justification. And third, IMC argues that the 2023 Order is arbitrary and capricious under the Administrative Procedure Act ("APA") because it lacks an adequate factual basis for the new restrictions, fails to respond meaningfully to material comments, and fails to justify its impacts on small businesses.

After careful review and with the benefit of oral argument, we agree with IMC that the FCC exceeded its statutory authority under the TCPA because the 2023 Order's new consent restrictions impermissibly conflict with the ordinary statutory meaning of "prior express consent." Accordingly, we grant IMC's petition for review, vacate Part III.D of the 2023 Order, and remand for further proceedings.

## I.     Background

We divide this background part into three sections. The first section describes IMC and the lead-generation industry—the industry most affected by the 2023 Order. The second section lays out the relevant statutory and regulatory frameworks. And the third section describes in more detail the 2023 Order.

### A.     Lead Generation and IMC

"IMC is a consortium of over twenty entities[] representing a cross[-]section of insurance industry stakeholders." IMC's mission is to "help protect the best interests of consumers by, among other things, promoting compliant[] best practices in insurance marketing and services." IMC's members include (1) lead generators that employ lead-generation techniques,

(2) merchants that rely on lead generators to promote their goods and services, and (3) consumers who rely on lead generators to compare products and services. IMC seeks review of Part III.D of the FCC's 2023 Order on behalf of its members.

"Lead generation [also known as 'performance marketing'] is the process of identifying and cultivating individual consumers . . . potentially interested in purchasing a product or service." Lead generation's goal is to connect the identified consumers with companies that sell the product or service the consumers are interested in purchasing. Identified consumers and their contact information are known as "leads." The companies that do the collecting are known as "lead generators." Lead generators often sell leads to the "end-buyer merchants" that sell the product or service the consumer is interested in purchasing. They also often sell the leads to "lead aggregators," or "intermediaries that take in leads collected by multiple" lead generators and "prepare them for sale to their clients—merchants or other aggregators."

Lead generation is common in the context of comparison shopping, which—in IMC's words—"provide[s] a one-stop means of comparing options for health insurance, auto loans, home repairs, and other services." Broadly speaking, lead-generating, comparison-shopping websites operate as follows. Consumers visit the comparison-shopping website and enter information about themselves and the product they want to purchase. The consumers consent to be contacted by the website's partners and

6                    Opinion of the Court                24-10277

affiliates that offer the product or service the consumers seek.  The website then runs its algorithm based on the consumers' information and "matches" the consumers with companies that offer what the consumers want.  The website then sells the "leads"—*i.e.*, the consumers' information—to the matched affiliates so that the affiliates can robocall or robotext the consumers with offers, quotes, or some other message.

### B.    Statutory and Regulatory Background

The 2023 Order is a regulation interpreting the phrase "prior express consent" in the TCPA.  Congress enacted the TCPA in response to a "torrent of vociferous consumer complaints about intrusive robocalls." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 614 (2020) (plurality opinion).  With some exceptions not relevant here, the TCPA prohibits calls made "using any automatic telephone dialing system or an artificial or prerecorded voice" without "the prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A), (B).  The statute does not define "prior express consent." *See id.*

Congress gave the FCC the authority to "prescribe regulations to implement" the TCPA.  *Id.* § 227(b)(2).  Congress also gave the FCC the authority to exempt certain calls from the TCPA's prohibitions.  *Id.* § 227(b)(2)(B), (C).  The FCC's TCPA regulations are codified at 47 C.F.R. § 64.1200 and represent decades of agency action.  Generally, with some exceptions not relevant here, the regulations prohibit robocalls and robotexts

24-10277                Opinion of the Court                7

made without the "prior express consent of the called party"—just like the TCPA.  *See* 47 C.F.R. § 64.1200(a)(1).

The FCC has determined that the meaning of "prior express consent" is different for different types of calls.  In 2012, the FCC declared by regulation that robocalls and robotexts that "include[] or introduce[] an advertisement or constitute[] telemarketing" must be accompanied not simply by prior express consent, but by "prior express written consent."  *Id.* § 64.1200(a)(2), (3); *see also* 2012 Order, 27 FCC Rcd. at 1838.[4]  That is, the FCC interpreted "prior express consent" in the TCPA to mean "prior express written consent" in the context of telemarketing and advertising robocalls.  *See* 2012 Order, 27 FCC Rcd. at 1838.[5]

> The regulations define "prior express written consent" as:
>
> an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or

---

[4] Under the regulations, "[t]he term advertisement means any material advertising the commercial availability or quality of any property, goods, or services."  47 C.F.R. § 64.1200(f)(1).  "The term telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  *Id.* § 64.1200(f)(13).

[5] For other robocalls—such as informational calls about "bank account balance[s], credit card fraud alert[s], package deliver[ies], and school closing[s]"—only "prior express consent" is required.  2012 Order, 27 FCC Rcd. at 1838; 47 C.F.R. § 64.1200(a)(1).

prerecorded voice, and the telephone number to
which the signatory authorizes such advertisements
or telemarketing messages to be delivered.

47 C.F.R. § 64.1200(f)(9). The written agreement must "include a
clear and conspicuous disclosure informing" the signing party that
he consents to telemarketing or advertising robocalls and
robotexts. *Id.* § 64.1200(f)(9)(i)(A).

### C.    *The 2023 Order*

The 2023 Order interprets "prior express consent" in the
TCPA to include—on top of the 2012 Order's written-consent
restriction—two new restrictions for telemarketing and advertising
robocalls.[6]

The first restriction on what it means to give "prior express
consent" declares that a called party can "authorize[] no more than
one identified seller" at a time to make telemarketing or advertising
robocalls to the called party. 2023 Order, 38 FCC Rcd. at 12297
(amending 47 C.F.R. § 64.1200(f)(9)). In other words, a called party

---

[6] To be clear, the 2023 Order seeks to modify the 2012 Order's definition of
"prior express written consent," which is codified at 47 C.F.R. § 64.1200(f)(9).
*See* 2023 Order, 38 FCC Rcd. at 12297 (amending 47 C.F.R. § 64.1200(f)(9)).
The 2012 Order's "prior express written consent" restriction and definition, in
turn, constitute the FCC's interpretation of "prior express consent" as used in
the TCPA. *See* 2012 Order, 27 FCC Rcd. at 1838 (noting that "the TCPA is
silent on what form of express consent . . . is required" and then stating that
the FCC "has discretion to determine, consistent with [c]ongressional intent,
the form of express consent required"). Therefore, by modifying the 2012
Order's definition of "prior express written consent," the 2023 Order
necessarily interprets the phrase "prior express consent" as used in the TCPA.

24-10277                Opinion of the Court                9

cannot give "prior express consent" to receive telemarketing or advertising robocalls from multiple parties unless the called party consents to receive calls from each individual caller separately. *Id.* at 12260–61; *id.* at 12261 ("[O]ur rule requires consent to one seller at a time."). As explained by IMC, under the 2023 Order, a consumer cannot give "prior express consent" by checking one checkbox that states that the consumer consents to telemarketing or advertising robocalls "from Bank A and Bank B." But checking two checkboxes—one for Bank A and one for Bank B—is presumably fine. *See id.* at 12260 (explaining that a consumer can never provide prior express consent for robocalls by checking one box consenting to a list of thousands of "marketing partners").[7] We refer to this restriction as the "one-to-one-consent" restriction.

The second restriction on what it means to give "prior express consent" states that consented-to telemarketing or advertising robocalls "must be logically and topically associated with the interaction that prompted the consent." *Id.* at 12297 (amending 47 C.F.R. § 64.1200(f)(9)). While the 2023 Order fails to define "logically and topically associated," *id.* at 12263, 12297, as an example, it states that "a consumer giving consent on a car loan comparison shopping website does not consent to get robotexts or robocalls about loan consolidation." *Id.* at 12263. In other words, because "loan consolidation" is apparently not "logically and topically associated with" car loans, a consumer cannot consent to receive robocalls about loan consolidation on a car loan website

_____

[7] The FCC does not dispute IMC's characterization of the 2023 Order.

even if he clearly and unequivocally states that he wants to receive such calls. *See id.*[8] We refer to this restriction as "the logically-and-topically-related" restriction.

In sum, under the 2023 Order, consumers cannot consent to receive robocalls (1) from more than one entity at a time or (2) whose subject matter is not logically and topically related to, for example, the website on which the consumer gives consent. *See id.* at 12297. Again, these two restrictions apply only to "advertisement[] or telemarketing" robocalls. *See id.* And they apply regardless of any facts showing "prior express consent" that may be present in a particular case. *See id.* We refer to these restrictions together as the "additional 'prior express consent' restrictions."

With this background in mind, we turn to IMC's challenges to the 2023 Order.

## II.    Standard of Review

The Hobbs Act, "which endows federal courts of appeals with 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of'" FCC rulings, governs our review. *Autauga Cnty. Emergency Mgmt. Commc'n Dist. v. FCC,*

---

[8] As IMC explains, the 2023 Order would invalidate "prior express consent" for calls about loan consolidation even if—on a car loan comparison shopping website—a consumer checks one box consenting to receive robocalls "from Bank A regarding auto loans," and at the same time checks another box consenting to receive robocalls "from Bank A regarding loan consolidation." Again, the FCC does not contest IMC's characterization of the 2023 Order.

24-10277                Opinion of the Court                11

17 F.4th 88, 97 (11th Cir. 2021) (quoting 28 U.S.C. § 2342).[9]  When reviewing agency action under the Hobbs Act, "we apply the standards from the [APA]." *Id*. at 98.  And under the APA, the scope of an agency's statutory authority and whether an agency has acted within that authority are legal questions we decide independently. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–92 & n.4, 413 (2024); *see* 5 U.S.C. § 706 (providing that when reviewing administrative action, "the reviewing court shall decide all relevant questions of law").

### III.    Discussion

Under the APA, courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" or "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).  IMC argues that the FCC exceeded its statutory authority under the TCPA in issuing its 2023 Order because the one-to-one-consent and logically-and-topically-related

---

[9] We note that the Supreme Court recently heard oral argument in *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, in which the question presented is whether the Hobbs Act requires district courts "to accept the FCC's legal interpretation of the Telephone Consumer Protection Act" in suits between private parties.  *See* Petition for a Writ of Certiorari at i, *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, No. 23-1226 (U.S. filed May 17, 2024).  Because this case is on direct review from the FCC, the question presented in *McLaughlin Chiropractic* is not relevant here.

restrictions impermissibly conflict with the ordinary statutory meaning of "prior express consent."[10]

After review, we agree with IMC that the FCC exceeded its statutory authority under the TCPA because the 2023 Order's "prior express consent" restrictions impermissibly conflict with the ordinary statutory meaning of "prior express consent." Accordingly, we grant IMC's petition for review, vacate Part III.D of the 2023 Order, and remand for further proceedings.

> A.    *The additional "prior express consent" restrictions in the 2023 Order exceed the FCC's statutory authority because they conflict with the ordinary statutory meaning of "prior express consent" in the TCPA*

IMC argues that the FCC exceeded its statutory authority in issuing the 2023 Order because the additional "prior express consent" restrictions conflict with the ordinary statutory meaning of "prior express consent" in the TCPA. In response, the FCC relies on 47 U.S.C. § 227(b)(2), which allows the FCC to "prescribe regulations to implement" the TCPA, for its authority to promulgate the additional "prior express consent" restrictions. 47

---

[10] IMC also argues that the 2023 Order (1) impermissibly defines "prior express consent" to mean one thing for telemarketing and advertising robocalls and another thing for non-telemarketing and non-advertising robocalls, (2) violates the First Amendment, and (3) is arbitrary and capricious under the APA. Because we vacate Part III.D of the 2023 Order based on the FCC's attempt to define "prior express consent" in a way that conflicts with that phrase's ordinary statutory meaning, we do not reach IMC's other challenges.

24-10277                Opinion of the Court                13

U.S.C. § 227(b)(2).[11]  The agency argues that the additional "prior express consent" restrictions are "fully consistent with the common understanding" of the phrase "prior express consent."[12] The parties are correct that this appeal turns on whether the additional "prior express consent" restrictions are consistent with the ordinary statutory meaning of "prior express consent" in the TCPA.[13]

---

[11] Other TCPA provisions further detail the FCC's authority.  *See, e.g.*, 47 U.S.C. § 227(b)(2)(B), (C) (allowing the FCC to exempt certain calls from the TCPA's prohibitions).  The FCC does not rely on those provisions here.

[12] The agency does not argue that § 227(b)(2) gives it the authority to define "prior express consent" inconsistently with the ordinary statutory meaning of that phrase.

[13] As mentioned above, IMC also argues that the FCC exceeded its statutory authority by impermissibly defining "prior express consent" to mean one thing for telemarketing and advertising robocalls, and another thing for non-telemarketing and non-advertising robocalls.  In other words, IMC argues that the FCC has no authority to apply the additional "prior express consent" restrictions to only telemarketing and advertising robocalls.

In response to that theory, the FCC argues that Congress gave it discretion to define "prior express consent" differently for different calls.  The FCC cites a statutory finding that states that the agency "should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with" the First Amendment.  Tel. Consumer Prot. Act, Pub. L. No. 102-243, § 2(13), 105 Stat. 2394, 2395 (1991) (codified at 47 U.S.C. § 227 note).

Even if the FCC has the authority to define "prior express consent" differently for different types of calls—a question we do not reach—its authority to do so says nothing about whether the FCC has the authority to interpret "prior express consent" in a way that conflicts overall with the ordinary statutory

With certain exceptions not relevant here, § 227(b)(1) of the TCPA generally prohibits making robocalls without the called party's "prior express consent."  47 U.S.C. § 227(b)(1)(A), (B). Notably, the TCPA requires only "prior express consent"—not "prior express consent" *plus*. *See id.*  Section 227(b)(2), in turn, gives the FCC the power to "prescribe regulations to implement" the TCPA's prohibition on unconsented-to robocalls.  *Id.* § 227(b)(2). To "implement" means "[t]o complete, perform, carry into effect (a contract, agreement, etc.); to fulfil[l] (an engagement or promise)."  *Implement*, *Oxford English Dictionary* (2d ed. 1989).  It does not mean to "alter."  Indeed, "[a]t the level of plain meaning, it seems to us a non sequitur to claim that a[n] [agency] can 'implement' a [statute] by issuing a regulation that is inconsistent with that [statute]."  *Solar v. City of Farmington*, 2 F.4th 1285, 1289 (10th Cir. 2021).  After all, "[a] generic grant of rulemaking authority to fill gaps . . . does not allow the FCC to alter the specific choices Congress made."  *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022).  And an agency cannot "decree[] a duty that the statute does not require and that the statute does not empower the [agency] to impose."  *Id.* at 819.  As another court has explained, § 227(b)(2)'s grant of authority to "implement" the TCPA gives the FCC only the authority to "reasonably define" the TCPA's consent

---

meaning of that phrase—the question we address here.  Perhaps recognizing this conclusion to be true, the FCC does not argue that it has discretion to define "prior express consent" in a way that conflicts with the phrase's ordinary statutory meaning.

provisions.  *See Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1082 & n.1 (D.C. Cir. 2017) (Kavanaugh, J.).

Accordingly, to determine whether the FCC exceeded its statutory authority in its 2023 Order, we must decide whether the additional "prior express consent" restrictions accord with the ordinary statutory meaning of "prior express consent" in the TCPA.  *See* 47 U.S.C. § 227(b)(1)(A), (B).  The questions we confront are straightforward: First, to give "prior express consent" for telemarketing or advertising robocalls, must a consumer *always* consent to calls from only one entity at a time (*i.e.*, give one-to-one consent)?  *See* 2023 Order, 38 FCC Rcd. at 12297.  And second, can a consumer give "prior express consent" to receive telemarketing or advertising robocalls *only when* the consented-to calls are "logically and topically associated with the interaction that prompted the consent"?  *See id*.  The answer to both questions is no, and the additional "prior express consent" restrictions thus fail.

Statutory interpretation begins and ends with the text.  *See In re Celotex Corp.*, 227 F.3d 1336, 1338 (11th Cir. 2000).  When a statute leaves a phrase undefined, we typically give that phrase its "plain and ordinary meaning."  *U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 976 (11th Cir. 2014).  But "[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."

*Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1252–53 (11th Cir. 2014) (quoting *Neder v. United States*, 527 U.S. 1, 21 (1999)).

Here, the TCPA leaves the phrase "prior express consent" undefined, but our precedent has filled the void. Given the statute's silence on what constitutes "prior express consent," we have held "that Congress sought to incorporate the 'common law concept of consent'" into the TCPA. *Lucoff v. Navient Sols., LLC*, 981 F.3d 1299, 1304 (11th Cir. 2020) (quoting *Osorio*, 746 F.3d at 1255) (discussing the phrase "prior express consent" in § 227(b)(1) of the TCPA). Thus, "[w]e use common law principles to interpret whether a party [gives] . . . their 'prior express consent' to receive calls under the TCPA." *Id.* (citing *Osorio*, 746 F.3d at 1255).

We have explained that under common law, "the basic premise of consent is that it is given voluntarily." *Osorio*, 746 F.3d at 1253 (quotation omitted). "[C]onsent is a willingness for certain conduct to occur." *Lucoff*, 981 F.3d at 1304 (quoting *Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1276 (11th Cir. 2017)). "[E]xpress consent," in turn, is "[c]onsent that is clearly and unmistakably stated." *Consent, Black's Law Dictionary* (12th ed. 2024); *see also Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1100 (11th Cir. 2019) (defining "express permission" in § 227(a)(5) to mean "permission that is clearly and unmistakably granted by actions or words, oral or written" (quotation omitted)). And "[t]he qualifier 'prior' modifying 'express [consent]' means that the [called party] must have given his express [consent] before" he received the call. *Gorss Motels*, 931 F.3d at 1100. Whether a party has given his "prior

express consent" depends "heavily" on the facts of each case. *Schweitzer*, 866 F.3d at 1279.

In this case, the 2023 Order's "prior express consent" restrictions conflict with the common law meaning of "prior express consent." We first analyze the one-to-one-consent restriction. We then turn to the logically-and-topically-related restriction.

> 1. The one-to-one-consent restriction conflicts with the ordinary statutory meaning of "prior express consent" in the TCPA

The one-to-one-consent restriction states that a consumer cannot consent to receive telemarketing or advertising robocalls from multiple entities unless the consumer consents to each caller separately. 2023 Order, 38 FCC Rcd. at 12261, 12297. So under the 2023 Order, even if a consumer "clearly and unmistakably" states, before receiving a robocall, that he is willing to receive telemarketing or advertising robocalls from multiple entities, the 2023 Order provides that consent cannot be given unless the consumer independently and separately consents to receive robocalls from each individual caller. *See id.*; *Gorss Motels*, 931 F.3d at 1100. In so doing, the 2023 Order exceeds the FCC's statutory authority.

Our prior case law explains the ordinary statutory meaning of "prior express consent." In *Gorss Motels*, we held that fax recipients gave their "prior express permission" to receive "faxed advertisements" by agreeing—in one franchise agreement—to

receive faxes both from a specific hotel and, more broadly, its "affiliates." 931 F.3d at 1100–02. The fax recipients were able to provide "prior express permission" to multiple, vaguely defined entities at one time. *See id.* at 1102 ("A fax recipient may provide his express permission to receive faxes from third parties, which the hotels did when they agreed in their franchise agreements with [an entity] to receive assistance with purchasing items from [the entity's] affiliates."). And like *Gorss Motels*, other cases from our Court and our sister circuits explain how broad "prior express consent" can be under the TCPA. *See Mais v. Gulf Coast Collection Bureau*, 768 F.3d 1110, 1124–25 (11th Cir. 2014) (finding prior express consent where the plaintiff's wife consented to robocalls from more than one entity at a time); *Lucoff*, 981 F.3d at 1302, 1306 (finding prior express consent where the plaintiff agreed to receive calls from multiple entities); *Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 791, 793–94 (9th Cir. 2018) (similar); *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 346–47 (6th Cir. 2016) (similar).

Thus, our cases show that to give "prior express consent" to receive a robocall, one need only "clearly and unmistakably" state, before receiving the robocall, that he is willing to receive the robocall. *See Gorss Motels*, 931 F.3d at 1100. One-to-one consent is not required. *See id.* at 1102. Because the one-to-one-consent restriction attempts to alter what we have said is the ordinary common law meaning of "prior express consent," the restriction falls outside the scope of the FCC's statutory authority to "implement" the TCPA. *See Nat'l Ass'n of Broads.*, 39 F.4th at 820

("A generic grant of rulemaking authority to fill gaps . . . does not allow the FCC to alter the specific choices Congress made.").

Though our case law, alone, shows why the one-to-one-consent restriction fails, the FCC's own brief provides even more support for our conclusion. There, the FCC all but concedes that the one-to-one-consent restriction alters the ordinary meaning of "prior express consent." In its brief, the agency states: "To be sure, there may be particular instances, as IMC contends, in which it would be reasonable to conclude that a consumer provides willing, informed agreement to receive robocall marketing from 'multiple named intermediaries.'" Better put, the FCC concedes that a consumer could give "prior express consent" under the TCPA where its 2023 Order categorically says a consumer could not. So as even the agency understands, the one-to-one-consent restriction is unlawful.

The FCC attempts to save the one-to-one consent restriction by arguing that consumers cannot be "presumed 'voluntarily' or 'willingly'" to consent to robocalls unless they consent to the calls on a one-to-one basis. This statement says nothing about whether consumers *can* consent to robocalls from multiple entities all at once. As the FCC itself admits, consumers no doubt can give "prior express consent" under the TCPA to receive robocalls from multiple parties without consenting to each caller separately. For under our case law, all consumers must do to give "prior express consent" to receive a robocall is clearly and unmistakably state, before receiving a robocall, that they are willing to receive the

20                    Opinion of the Court                    24-10277

robocall.  *See Gorss Motels*, 931 F.3d at 1100; *Schweitzer*, 866 F.3d at 1279.  But the one-to-one-consent restriction impermissibly rejects consent in such cases.  The restriction thus exceeds the FCC's statutory authority to "implement" the TCPA.

As perhaps a Hail Mary, the FCC suggests that because the 2023 Order is good policy, it is necessarily lawful.  That argument fails, too.  Atextual good policy cannot overcome clear text.  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."); *Bais Yaakov*, 852 F.3d at 1083 (observing that an agency's opinion that its rule is "good policy" "does not change the statute's text").  And here, the TCPA's text is clear: Callers must obtain "prior express consent"—not "prior express consent" *plus*.  *See* 47 U.S.C. § 227(b)(1)(A), (B).  The FCC has no authority to dictate otherwise.  We thus reject the FCC's one-to-one-consent restriction.

> 2.    The logically-and-topically-related restriction conflicts with the ordinary statutory meaning of "prior express consent" in the TCPA

The logically-and-topically-related restriction is equally unlawful.  That restriction states that consented-to telemarketing or advertising robocalls "must be logically and topically associated with the interaction that prompted the consent."  2023 Order, 38 FCC Rcd. at 12297 (amending 47 C.F.R. § 64.1200(f)(9)).  That is, unless a robocall's subject matter is "logically and topically" related to the "interaction" that prompted the consent, there is no consent

to receive a robocall even if a consumer "clearly and unmistakably" states, before receiving the robocall, that he is willing to receive the robocall.  *See Gorss Motels*, 931 F.3d at 1100.  Just like the one-to-one consent restriction, then, this restriction impermissibly alters what it means to give "prior express consent."  *See id.*

As IMC points out, a consumer can provide prior express consent "'clearly and unmistakably' . . . on a website with no logical or topical relationship to the call being consented to."  For example, a consumer can consent to calls about "loan consolidation" while shopping online for "auto loans."  Yet the 2023 Order purports to bar such consent.  *See* 2023 Order, 38 FCC Rcd. at 12263.[14]  Again, even if a consumer visiting a car loan

---

[14] IMC provides the following example in its brief:



Per the graphic, a consumer presumably could give "prior express consent" to receive calls about both auto loans and loan consolidation by checking both checkboxes.  But the 2023 Order would invalidate any consent as to the calls about loan consolidation because the consumer is giving the consent on "CarLoansWebsite.com."  Apparently, "loan consolidation" is not "logically and topically associated with" car loans.  *See* 38 FCC Rcd. at 12263 (stating that "a consumer giving consent on a car loan comparison shopping website does not consent to get robotexts or robocalls about loan consolidation").  Beyond this example, what "logically and topically associated" means is anyone's

website "clearly and unmistakably" states, before receiving a robocall, that he is willing to receive telemarketing or advertising robocalls about loan consolidation, the 2023 Order states that no consent can be given. *Id.* at 12263, 12297. The FCC's authority to "implement" the TCPA gives it no authority to mandate such a result. *See Nat'l Ass'n of Broads.*, 39 F.4th at 820 (explaining that a general grant of statutory authority to implement statutes does not allow agencies to "alter the specific choices Congress made").

The FCC's concession at oral argument bolsters our conclusion. Counsel was given a hypothetical situation in which a consumer checks three boxes agreeing to receive robocalls from three different mortgage companies. The consumer then checks a fourth box agreeing to receive robocalls from a home repair business. Counsel agreed that the 2023 Order's logically-and-topically-related restriction would invalidate the consumer's consent to receive robocalls from the home repair business. Critically, though, counsel then "absolutely" agreed that "without the [2023 Order] the [TCPA] would allow" that consumer to consent to the home repair business's calls. Because the logically-and-topically-related restriction would preclude consent where,

---

guess. The FCC "decline[d] to adopt a definition of 'logically and topically'" in the 2023 Order because it supposed that robocallers would "err on the side of limiting" the content of their calls "to what consumers would clearly expect." *Id.*

under the TCPA, there indeed could be consent, the restriction fails.

The FCC resists this conclusion by arguing—just as it does with the one-to-one-consent restriction—that consumers cannot be "presumed 'voluntarily' or 'willingly' to invite robocalls" from entities on a website "when the listed entities have no logical or topical connection to the website."   But as explained above, whether a consumer can be "presumed" to consent to robocalls in a particular situation says nothing about whether a consumer has in fact consented to robocalls in that situation.   As long as a consumer clearly and unmistakably states, before receiving the robocall, that he is willing to receive the robocall, he has given "prior express consent" under the TCPA. *See Gorss Motels*, 931 F.3d at 1100; *Schweitzer*, 866 F.3d at 1279.

And to the extent the FCC argues that the logically-and-topically-related restriction is lawful because it is good policy, that argument fails for the same reasons given above.   Again, atextual good policy cannot overcome clear text. *Bais Yaakov*, 852 F.3d at 1083.   And here, the TCPA's text is clear: Callers must obtain "prior express consent"—not "prior express consent" *plus*. *See* 47 U.S.C. § 227(b)(1)(A), (B).

⋆     ⋆     ⋆

The 2023 Order impermissibly invalidates a consumer's "prior express consent" in two situations when "prior express consent" has been given under the TCPA. *See Gorss Motels*, 931 F.3d at 1100 (explaining that to give "prior express permission" to

receive an unsolicited fax, one need only clearly and unmistakably state, before receiving the unsolicited fax, that he is willing to receive the unsolicited fax). Under the 2023 Order, no longer must robocallers merely obtain "prior express consent," as the TCPA requires. Instead, they must go through the pains of obtaining prior express consent (1) on a one-to-one basis and (2) during an "interaction" that is "logically and topically associated" with the subject matter of the robocalls. 2023 Order, 38 FCC Rcd. at 12297. At bottom, the FCC has "decreed a duty [on lead generators] that the statute does not require and that the statute does not empower the FCC to impose." *Nat'l Ass'n of Broads.*, 39 F.4th at 819. The FCC therefore exceeded its statutory authority in redefining "prior express consent" to include the additional "prior express consent" restrictions.[15]

---

[15] The FCC also argues that its *Urth Access* enforcement action supports its additional "prior express consent" restrictions. There, Urth Access made student loan robocalls after it had sought prior express consent to make calls concerning unrelated topics and had hidden a list of more than 5,000 potential callers on a secondary website. 37 FCC Rcd. 14133, 14139 (2022).

We are not bound by the FCC's *Urth Access* decision when it comes to determining what it means to give "prior express consent" under the TCPA. *See Loper Bright*, 603 U.S. at 392 (explaining that under the APA, it is "the responsibility of the court to decide whether the law means what the agency says"). Nor do we see how an enforcement action with particularly egregious facts compels the conclusion that the FCC has the statutory authority to redefine "prior express consent" in a way that conflicts with the ordinary statutory meaning of that phrase.

24-10277                 Opinion of the Court                    25

B.      *Vacatur is the appropriate remedy*

IMC asks us to vacate Part III.D of the 2023 Order.  The FCC does not contest vacatur as the appropriate remedy should IMC prevail.

"[V]acatur . . . is the ordinary APA remedy," but it is not the only one. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (quotation omitted).  Remand without vacatur is also available.  *See id.*  When considering whether to vacate and remand, or just remand, we consider "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Id.* (quotation omitted).  "The decision . . . to vacate agency action falls within our broad equitable discretion." *Id.*

We conclude that vacatur is appropriate here.  The FCC has impermissibly exceeded its statutory authority by attempting to redefine "prior express consent" to include the additional restrictions.  And exceeding statutory authority is a serious defect. *See Bais Yaakov*, 852 F.3d at 1082–83 (vacating FCC order because it exceeded statutory authority).  Vacatur is therefore appropriate.[16]

---

[16] We recognize that there is an ongoing debate about whether the APA authorizes vacatur. *Compare, e.g.*, *United States v. Texas*, 599 U.S. 670, 695–704 (2023) (Gorsuch, J., concurring) (doubting that the APA authorizes vacatur), *with Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799, 826–43 (2024) (Kavanaugh, J., concurring) (opining that "vacatur is an appropriate remedy when a federal court holds that an agency rule is unlawful").  We do

### IV.    Conclusion

In its attempt to "implement" the TCPA, the FCC overstepped statutory boundaries.   *See* 47 U.S.C. § 227(b)(2). "Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'" *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (alteration in original) (quoting Ernest Gellhorn & Paul Verkuil, *Controlling Chevron-Based Delegations*, 20 Cardozo L. Rev. 989, 1011 (1999)).   But changing the plot line is exactly what the FCC tried to do here.   "Congress drew a line in the text of the statute" between "prior express consent" and something more burdensome. *Bais Yaakov*, 852 F.3d at 1082; *see* 47 U.S.C. § 227(b)(1)(A), (B).   Rather than respecting the line that Congress drew, the FCC stepped right over it. *See Bais Yaakov*, 852 F.3d at 1082.

For these reasons, we grant IMC's petition for review, vacate Part III.D of the 2023 Order, and remand for further proceedings.

**PETITION GRANTED; ORDER VACATED IN PART AND REMANDED.**

---

not join that debate here because, as mentioned, the FCC does not contest vacatur as an available remedy.